The DOW CHEMICAL COMPANY, Plaintiff,

v.

UNITED STATES of America, By and Through Anne M. GORSUCH, Administrator, Environmental Protection Agency, Defendants.

Civ. No. 78–10044.

United States District Court, E. D. Michigan, N. D.

April 19, 1982.

Jane M. Gootee, John Gleeson, Bernd W. Sandt, Haskell H. Shelton, Midland, Mich., for Dow Chemical Co.

Jose R. Allen, Dept. of Justice, J. Daniel Berry, EPA, Washington, D. C., for EPA.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

### I. *Introduction*

This case involves a constitutional and statutory challenge to the use of warrantless aerial photography of a chemical manufacturing plant by the Environmental Protection Agency (EPA). The Dow Chemical Company (Dow) asserts that this activity by the EPA constitutes an unreasonable search in violation of the Fourth Amendment, a taking and misappropriation of trade secrets in violation of the Fifth Amendment, and the use of an inspection tool which is outside the scope of EPA's statutory authority under Sections 113 and 114 of the Clean Air Act, 42 U.S.C. §§ 7413–7414

(1980). Dow seeks a declaratory judgment and injunctive relief.

## II. *Facts*

The Dow Chemical Company owns and operates a 2000 acre manufacturing plant in Midland, Michigan. In the latter part of 1977 EPA, the governmental agency primarily charged with administering and enforcing the federal pollution laws, was conducting an investigation of Dow to check emissions from the power houses located inside Dow's facility for possible violations of federal air quality standards.

In September of 1977, EPA made an on-site inspection of the power houses at Dow's plant. After the inspection EPA requested, and later received, schematic drawings of the power houses from Dow.

In December of 1977 EPA again contacted Dow and requested a subsequent entry for purposes of inspecting the power houses. Prior to making this request EPA had already begun preparations for a planned enforcement action against Dow.[1] EPA informed Dow that as part of the inspection it would be taking photographs of the Dow layout and facility. Dow objected to EPA's intention to take photographs and therefore denied EPA's request for entry. In response, EPA suggested to Dow that it would consider seeking a search warrant to gain entrance to the plant.

Rather than institute a civil action or seek a search warrant, EPA decided to obtain aerial photographs of Dow's facility. On February 6, 1978, EPA contracted with Abrams Aerial Survey Corporation (Abrams), a private company located in Lansing, Michigan, to take aerial photographs of the Dow plant. EPA specifically informed Abrams as to the altitude, location, and direction from which the photographs were to be taken.

In the afternoon of February 7, 1978 Abrams flew over Dow's plant as directed. The aircraft made at least 6 passes over the plant at altitudes of 12,000, 3,000, and 1,200 feet. Abrams used a sophisticated Wild RC–10 aerial mapping camera to take approximately 75 color photographs of various parts of the Dow plant.[2]

The Court has carefully examined all of the photographs and has been struck by their vivid detail and resolution. As amply demonstrated by Dow at a hearing before the Court, some of the photographs taken from directly above the plant at 1,200 feet are capable of enlargement to a scale of 1 inch equals 20 feet *or greater*, without significant loss of detail or resolution. When enlarged in this manner, and viewed under magnification, it is possible to discern equipment, pipes, and power lines as small as ½ inch in diameter. Many of these minute, but observable items are located in *interior* regions of the plant which are surrounded by buildings and other structures which make observation from anywhere but *directly above*, a near physical impossibility.[3]

Dow was not aware of the EPA flyover either before or during its occurrence. When it subsequently became aware of this event a few weeks later, from sources other than EPA, Dow immediately instituted this action.

---

1. A clean air act enforcement action was eventually filed and is presently pending before the Honorable Stewart A. Newblatt of this District. *United States v. Dow Chemical Company*, No. 80–10011 (ED Mich., filed January 25, 1980).

2. It is important to an understanding of this case to provide a description of the highly effective equipment used by Abrams. The aircraft used was a twin engine Beechcraft, which Abrams describes as able to "provide photographic stability, fast mobility and flight endurance required for precision photography." *Handbook on Aerial Surveys & Photogrammetry—Abrams Aerial Survey Corporation.* The camera used by Abrams cost in excess of $22,-

000.00 and is described by the company as the "finest precision aerial camera available." *Id.* The camera was mounted to the floor inside the aircraft and was capable of taking several photographs in precise and rapid succession. *Id.*

3. Throughout its brief, EPA has used the term *exterior* to describe the areas depicted in the photographs. Dow has implied that these same photographs depict *interior* areas of the plant. While none of the photographs are actually x-rays of the *inside* of buildings or structures, based on its examination, and for the reasons stated above, the Court finds that the photographs more closely approximate a view of the *interior* of the plant than the *exterior*.

III. *Jurisdiction and Issues Presented*

The Court has jurisdiction over the subject matter herein pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, and 28 U.S.C. §§ 2201–2202.

This action presents 3 central issues for the Court's consideration:

    I.   Whether the EPA flyover and aerial photography of Dow's facilities constitutes an unreasonable search in violation of the Fourth Amendment;

    II.   Whether aerial photography of Dow's plant by EPA constitutes a taking of property (trade secrets) without due process in violation of the Fifth Amendment; and

    III.   Whether EPA exceeded its statutory authority under Sections 113 and 114 of the Clean Air Act in using warrantless aerial photography as an investigatory tool.

The matter is presently before the Court on cross motions for summary judgment. Dow seeks summary judgment on the Fourth Amendment and statutory issues, and EPA seeks entry of summary judgment on all issues.

This case is appropriate for summary judgment on the Fourth Amendment and Clean Air Act questions, since the material facts relative to these claims are not in dispute, and a decision thereon can be rendered as a matter of law. F.R.Civ.P. 56(c). *See Felix v. Young*, 536 F.2d 1126, 1130 (CA 6, 1976). As to the Fifth Amendment claim, however, and for reasons more fully described later in this opinion, *infra*, genuine issues of material fact exist which render disposition of that question by summary judgment inappropriate. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 855 (CA 6, 1978).

For the reasons stated below, the Court concludes that the EPA flyover and aerial photography violated Dow's rights under both the Fourth Amendment and the Clean Air Act. Partial summary judgment on these issues will therefore be entered in favor of Dow and against EPA.

IV. *Discussion*

### FOURTH AMENDMENT

[1] The first clause of the Fourth Amendment to the United States Constitution provides that, "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable. searches and seizures, shall not be violated..." As the very language of this amendment makes clear, the Constitution does not proscribe all governmental searches and seizures, only those that are *unreasonable.*

Dow puts forth at least 3 analytical arguments in support of its position that the overhead flight and aerial photography by EPA constituted an unreasonable search: first, under *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), that a warrantless search is *per se* unreasonable; second, under *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) that this was an unreasonable warrantless inspection; and third, under *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that EPA violated Dow's reasonable expectation of privacy. The Court will separately address each of these contentions.

Before turning to Dow's first assertion, the Court wishes to point out that the EPA has admitted, both in its briefs and at oral argument, that the flyover constituted both a "quest for evidence"[4] and a "search" of Dow's plant. (EPA Brief at 9; Transcript of oral argument at 44).[5] EPA has also admitted that the search was conducted

---

**4.** EPA was admittedly attempting to gather evidence for a planned enforcement proceeding against Dow. An action was later filed and is still pending. See note 1 *supra.*

**5.** Paradoxically, EPA later asserts that the "open fields" exception of *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) applies to this case, making EPA's actions a "non-search" and taking it outside the protection of the Fourth Amendment. (EPA Brief at 13–15). The Court, however, rejects the applicability of the "open fields" exception to this case and therefore independently concludes that a search occurred. *See* Discussion, Section IV(D) *infra.*

without first securing a warrant. *Id.* With these two premises established, the Court need only determine whether the search was *unreasonable* within the meaning of the Fourth Amendment.

### A. *Per Se Unreasonable*

Subject only to "a few specifically established and well-delineated exceptions," warrantless searches have been recognized as *per se* unreasonable and therefore violative of the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2031–2032, 29 L.Ed.2d 564 (1971). On the basis of this principle, Dow asserts that EPA's aerial search of its facility, without prior judicial scrutiny or oversight, is *per se* unreasonable.[6] Relying upon *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), EPA responds that warrantless searches of commercial establishments are not *per se* prohibited by the Fourth Amendment, but are only impermissible if they violate a legitimate expectation of privacy.

In the area of administrative inspections, wherein this case "roughly" fits, the Supreme Court appears to have retreated somewhat from the hard and fast conclusion that warrantless searches are *per se* unreasonable.[7] In *Marshall v. Barlow's Inc.*, 436 U.S. at 313, 98 S.Ct. at 1820, the Court, in tracing some of its earlier decisions, used the phrase "*generally* unreasonable" to describe warrantless administrative searches. Later in the same opinion the Court stated that "the reasonableness of a warrantless search ... will depend upon the specific enforcement needs and privacy guarantees of each statute." *Id.* at 322, 98 S.Ct. at 1825. In its most recent decision in this area, the Court in *Donovan v. Dewey*, 452 U.S. at 599, 101 S.Ct. at 2538, 69 L.Ed.2d at 269–270, announced that:

> ... the Fourth Amendment protects the interest of the owner of property in being free from *unreasonable* intrusions onto his property by agents of the government. Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests.
>
> .    .    .    .    .
>
> ... a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.[8]

On the basis of this authority, the Court agrees with EPA that, under the facts of this case, the Fourth Amendment inquiry does not end—with a decision adverse to

---

6. Dow's position in this regard is not without sound policy considerations to support it. As the Supreme Court stated in *Katz*, 389 U.S. at 359, 88 S.Ct. at 515:

   Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures. The government agents here ignored 'the procedure of antecedent justification ... that is central to the Fourth Amendment,' a procedure that we hold to be a constitutional precondition of the kind of electronic surveillance involved in this case.

   *See also Marshall v. Barlow's Inc.*, 436 U.S. at 323, 98 S.Ct. at 1825. This "constitutional precondition" is the genesis of this Court's ultimate conclusion in this case that *at a minimum*, EPA should have secured an ex parte warrant before carrying out the aerial search. *See* note 20 and accompanying text, *infra*.

7. The Sixth Circuit, however, continues to adhere to the principle that warrantless administrative searches are *per se* unreasonable. *United States v. Blue Diamond Coal Co.*, 667 F.2d 510 (CA 6, 1981).

8. This Court's citation of the language above is not to suggest that the Court finds a parallel between the authority of the EPA under the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, and the Department of Labor under the Federal Mine Safety and Health Act, 30 U.S.C. § 801 *et seq.*; it does not. The language is quoted only as support for the Court's determination that a warrantless administrative inspection is not *per se* unreasonable, and that a more sensitive reading of the Fourth Amendment is required in this case.

the government—once it is established that a warrantless administrative search occurred. The question must turn on whether EPA's authority under the Clean Air Act meets the "sufficiently comprehensive and defined" criteria of *Donovan v. Dewey, supra,* or whether the search violated a reasonable expectation of privacy. *See United States v. Taborda,* 635 F.2d 131, 136 (CA 2, 1980); *United States v. DeBacker,* 493 F.Supp. 1078, 1081 (WD Mich., 1980).

### B. *Administrative Inspection*

The question of the reasonableness of a commercial entity's expectation of privacy is necessarily intertwined with, and must be considered in the context of, the Supreme Court's decisions in the area of administrative inspections.[9] Most recent in this relatively short line of authority is *Marshall v. Barlow's Inc., supra,* and *Donovan v. Dewey, supra.*

Dow asserts that *Barlow's,* wherein the Court held that a warrantless administrative inspection under the Occupational Safety and Health Act, 29 U.S.C. § 657(a) (1970) (OSHA) violated the Fourth Amendment, controls this case. EPA, on the other hand, maintains that *Dewey,* which upheld a warrantless administrative search under the Federal Mine Safety and Health Act, § 103(a), 30 U.S.C. § 813(a) (1977) (FMSHA), controls the present facts. For the reasons expressed below, the Court holds that this case is governed by the principles and rationale of *Barlow's.*

The Fourth Amendment's prohibition against unreasonable searches was extended to administrative inspections of private commercial property nearly a decade and a half ago. *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). The reason for this extension was found in the basic purpose of the amendment, which is "to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara,* 387 U.S. at

528, 87 S.Ct. at 1730. Unlike searches of private homes, however, which generally must be conducted pursuant to a warrant in order to be reasonable, "legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." *Dewey,* 452 U.S. at 598, 101 S.Ct. at 2538, 69 L.Ed.2d at 268.

The touchstone of any decision on the legality of a warrantless administrative search is a consideration of the type of business involved, and an analysis of the "pervasiveness and regularity" of the applicable legislative scheme. *Dewey, supra,* 452 U.S. at 604, 101 S.Ct. at 2541, 69 L.Ed.2d at 273. *Barlow's* and its progeny, *Camara* and *See,* created the general rule that absent consent, a warrant is constitutionally required before an administrative inspection may be conducted. From this general rule, certain narrowly defined exceptions have been carved out. In *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 73, 90 S.Ct. 774, 775, 25 L.Ed.2d 60 (1970), the Supreme Court recognized that because the alcoholic beverage industry had long been "subject to close supervision and inspection," Congress enjoyed "broad power to design such powers of inspection ... as it deems necessary to meet the evils at hand." *Id.* at 76–77, 90 S.Ct. at 776–777. Similarly, in *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), the Court concluded that the federal statute regulating firearms provided a sufficiently comprehensive and predictable inspection scheme that the warrantless inspections mandated under the statute did not violate the Fourth Amendment. *Id.* at 316, 92 S.Ct. at 1596. Most recently, in *Donovan v. Dewey, supra,* the Court held that "warrantless inspections required by the Mine Safety and Health Act do not offend the Fourth Amendment." *Id.* 452 U.S. at 602, 101 S.Ct. at 2539, 69 L.Ed.2d at 271. The Court explained that:

> ... the Mine Safety and Health Act applies to industrial activity with a notorious history of serious accidents and

---

**9.** As the Court stated in *Marshall v. Barlow's Inc.,* 436 U.S. at 313, 98 S.Ct. at 1820, citing *Katz v. United States, supra,* "certain indus- tries have such a history of government oversight that no reasonable expectation of privacy could exist ..."

unhealthful working conditions. The Act is specifically tailored to address those concerns, and the regulation of mines it imposes is sufficiently pervasive and defined that the owner of such a facility cannot help but be aware that he 'will be subject to effective inspection' . . . First, the Act requires inspection of all mines and specifically defines the frequency of inspection. . . . Second, the standards with which a mine operator is required to comply are all specifically set forth in the Act or in Title 30 of the Code of Federal Regulations.

. . . Thus, rather than leaving the frequency and purpose of inspections to the unchecked discretion of government officers, the Act establishes a predictable and guided federal regulatory presence. Like the gun dealer in Biswell, the operator of a mine 'is not left to wonder about the purposes of the inspector or the limits of his task.'

*Id.* 452 U.S. at 603, 101 S.Ct. at 2540, 69 L.Ed.2d at 272 (citations omitted).[10]

EPA relies heavily on the language of *Dewey*,[11] but makes no argument that EPA's authority to regulate the chemical industry under the Clean Air Act constitutes a sufficiently "predictable and guided federal regulatory presence" as to include it as an exception to the general rule prohibiting warrantless administrative inspections. This is understandable, since it is clear to this Court that no such plausible argument can be made.

Unlike the government's control over the alcohol, firearms, and mining industries, the chemical industry is not "pervasively regulated" by EPA under the Clean Air Act. EPA's authority to regulate entities such as Dow is more closely akin to the authority of the Department of Labor under OSHA which the Supreme Court reviewed in *Barlow's*. The Court described that authority as follows:

(OSHA) imposes health and safety standards on all businesses engaged in or affecting interstate commerce that have employees . . . and authorizes representatives of the Secretary to conduct inspections to ensure compliance with the act . . . However, the Act fails to tailor the scope and frequency of such administrative inspections to the particular health and safety concerns posed by the numerous and varied businesses regulated by the statute.

*Donovan v. Dewey*, 452 U.S. at 601, 101 S.Ct. at 2539, 69 L.Ed.2d at 270 (citations omitted).

As one commentator, himself a former Assistant Regional Counsel for the EPA, accurately observed:

EPA, like OSHA, regulates all kinds of industries. Once again, the test is not whether the industry is regulated, but whether it is *pervasively* regulated. Although certain environmental statutes, the Federal Water Pollution Control Act (FWPCA), for example, are licensing statutes in the very broadest sense, such licensing and regulation is distinguishable from that which was present in *Colonnade* or in *Biswell*. The scope of the FWPCA is much more akin to the kind of regulation that exists under the auspices of OSHA. Both OSHA and EPA regulate a broad spectrum of different industries pursuant to legislative mandates. However, these myriad businesses are not necessarily highly regulated industries which may be said by implication to consent to warrantless inspections. In that sense, *Barlow's, Inc.'s* finding of the non-applicability of this exception in an OSHA context also applies to EPA.

---

**10.** Even prior to the Supreme Court's decision in *Dewey*, the Sixth Circuit had upheld a similar warrantless inspection of a sand and gravel quarry. *Marshall v. Nolichuckey Sand Co. Inc.*, 606 F.2d 693 (CA 6, 1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980).

**11.** EPA's reliance on *Dewey* appears to be for the proposition that the lesser degree of Fourth Amendment protection accorded commercial premises in general, and the federal regulation of the chemical industry in particular, undercuts and thereby diminishes Dow's reasonable expectation of privacy. This assertion is addressed by the Court later in this opinion. *See* Discussion, Section IV(C) *infra*.

Martin, *EPA and Administrative Inspections*, 7 Fla.St.L.Rev., 123, 131–132 (1979).

The only statutory provision authorizing administrative inspections in the Clean Air Act is Section 114, 42 U.S.C. § 7414.[12] This provision potentially applies to any number of different industries. By its terms it neither requires or defines the type or frequency of inspections, nor contains standards by which they are to be conducted. In fact, on its face, this provision does not appear to allow forced entry without some form of prior judicial oversight.[13] The Supreme Court has already recognized this limitation in the Clean Air Act in its *Barlow's* decision wherein it observed:

> Some statutes already envision resort to federal-court enforcement when entry is refused, employing specific language in some cases . . .
>
> > (an) example is the Clean Air Act, which grants federal district courts jurisdiction "to require compliance" with the Administrator of the Environmental Protection Agency's attempt to inspect under 42 U.S.C. § 7414, when the Administrator has commenced "a civil action" for injunctive relief or to recover a penalty.
>
> 436 U.S. at 321 n.18, 98 S.Ct. at 1825 n.18 and accompanying text.

In addition, the legislative history of the Clean Water Act, 33 U.S.C. §§ 1251–1376, also supports the observation that forced entry, or warrantless inspection, is not contemplated under the Clean Air Act. The Senate Report to the Act states that "*As under the Clean Air Act*, the Committee expects that authority to enter will be used judiciously and upon any challenge to entry the Committee expects the Administrator to obtain the necessary warrant." S.Rep. No.92–44, 92d Cong., 1st Sess. 62, *reprinted in* [1972] U.S.Code Cong. & Ad.News 3668, 3729 (emphasis added).

The inescapable conclusion of the foregoing judicial and legislative pronouncements is that the holding and rationale of *Barlow's* controls this case. Therefore, EPA's warrantless aerial search of Dow's plant cannot withstand Fourth Amendment scrutiny. The repugnance of this form of warrantless inspection activity was well stated by the Supreme Court in *Barlow's*, 436 U.S. at 323–324, 98 S.Ct. at 1825–1826:

> The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing a specific neutral criteria. Also, a warrant would then and there advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed. These are important functions for a warrant to perform, functions which underlie the Court's prior decisions that the Warrant Clause applies to inspections for compliance with regulatory statutes[14]

---

12. Section 114 of the Clean Air Act provides in pertinent part that:

(a) For the purpose . . . (ii) of determining whether any person is in violation of any such standard or any requirement of such a plan, or (iii) carrying out any provision of this chapter . . .

(2) the Administrator or his authorized representative, upon presentation of his credentials—

(A) shall have a right of entry to, upon, or through any premises of such person or in which any records required to be maintained under paragraph (1) of this section are located, and

(B) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under paragraph (1), and sample any emissions which such person is required to sample under paragraph (1).

13. *See* note 27 and accompanying text, *infra*.

14. It is indeed curious that in the present case EPA argues that its warrantless search of Dow was not inconsistent with the *Barlow's* decision, when a published EPA memorandum suggests that as a matter of agency policy, its position is otherwise:

> *Barlow's* clearly establishes that the owner does have the right to ask for a warrant under normal circumstances. Therefore, refusal to allow entry for inspectional purposes

For these reasons, the Court concludes that EPA's aerial photography of Dow's facilities, in an admitted quest for evidence, constituted an unreasonable search in violation of the Fourth Amendment.

In the typical administrative inspection case the Court's Fourth Amendment inquiry would halt at this point. This case, however, is not "typical" in any sense of the word. We are not here dealing with an ordinary *on-site* administrative search, neither are we faced with one of the more common Fourth Amendment challenges. Indeed, the Court's research suggests that, considering the facts before it, it is venturing into unchartered constitutional territory.

Both Dow and EPA devoted most of their attention, in briefing and arguing this case, to an analysis of the present facts under the Supreme Court's decision in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and subsequent interpretive decisions. This Fourth Amendment analysis, as applied to this case, focuses on the question of whether Dow had a reasonable expectation of privacy which was violated by EPA's flyover and photography of Dow's plant.

The Court is fairly certain that the Fourth Amendment issue raised in this case is properly resolved on the basis of an administrative inspection analysis alone. Given, however, the atypical nature of this case, the fact that the parties have explored the *Katz* analysis at length, and the additional fact that this analysis raises several important sub-issues and policy considerations, the Court will alternatively review the facts before it under the framework of *Katz*.

C. *Expectation of Privacy*

■ In *Katz v. United States*, 389 U.S. at 351–352, 88 S.Ct. at 511–512, the Supreme Court observed that:

the Fourth Amendment protects people, not places. What a person knowingly exposes to the public even in his own home or office, is not a subject of Fourth amendment protection ... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

Justice Harlan, in a concurring opinion which has since become the prevailing formulation for evaluating the legality of a search, *see Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Bailey*, 628 F.2d 938 (CA 6, 1980); erected a twofold requirement to determine whether one possesses an expectation of privacy which is protectable under the Fourth Amendment. This test was best described by Justice Blackmun in *Smith v. Maryland*, 442 U.S. 735, 736, 740, 99 S.Ct. 2577, 2578, 2580, 61 L.Ed.2d 220 (1979):

... the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action ... This inquiry, as Mr. Justice Harlan aptly noted in his Katz concurrence, normally embraces two discrete questions. *The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,'* 389 U.S., at 361 [88 S.Ct. 507 at

will not lead to civil or criminal penalties if the refusal is based on the inspector's lack of a warrant and one of the exemptions discussed in Part C does not apply. If the owner were to allow the inspector to enter his establishment only in response to a threat of enforcement liability, it is quite possible that any evidence obtained in such an inspection would be inadmissible. An inspector may, however, inform the owner who refuses entry that he intends to seek a warrant to compel the inspection. In any event, when entry is refused, the inspector should leave the premises immediately and telephone the

designated Regional Enforcement Attorney as soon as possible for further instructions. The Regional Enforcement Attorney should contact the U. S. Attorney's Office for the District in which the establishment desired to be inspected is located and explain to the appropriate Assistant United States Attorney the need for a warrant to conduct the particular inspection.

*EPA Memorandum on Inspection Procedures*, 41 Envir.Rep. (BNA) 2451, 2452 (April 11, 1979). It is undisputed that in this case, Dow specifically refused EPA's request for entry prior to the flyover.

516, 19 L.Ed.2d 576]—whether, in the words of the Katz majority, the individual has shown that 'he seeks to preserve [something] as private.' Id. at 351 [88 S.Ct. 507 at 511, 9 L.Ed.2d 576]. *The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as 'reasonable.'* id., at 361 [88 S.Ct. 507 at 516, 19 L.Ed.2d 576]—whether, in the words of the Katz majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances. (citations omitted; emphasis added).

This Court must now apply this two-part test to the facts before it.

1. *Dow's Privacy Expectation*

■ The extent of any claimed privacy expectation must be evaluated in light of the identity of the party seeking to invoke the protections of the Fourth Amendment. *Donovan v. Dewey, supra; GM Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). While the expectation of privacy that the owner of commercial property enjoys "differs significantly from the sanctity accorded an individual's home," *Id.,* it is clear that a commercial establishment may possess a protectable privacy expectation under the Fourth Amendment. *Marshall v. Barlow's Inc., supra.*

■ The first part of the *Katz* test appears to require that a party's actual state of mind be determined. Various courts, however, have interpreted this aspect of the test as an "objective" rather than a "subjective" requirement. *United States v. Taborda,* 635 F.2d 131, 137 (CA 2, 1980); *United States v. Kim,* 415 F.Supp. 1252, 1256–1257 (D.Haw., 1976); *accord United States v. Bailey,* 628 F.2d 938, 942–943 (CA 6, 1980). This Court agrees with this interpretation, and concludes that the essence of the first prong of the test is that the party "must have acted in such a way that it would have been reasonable for him to expect that he would not be observed." *United States v. Taborda, supra.* Therefore, the Court must look to objective manifestations of any claimed privacy expectation.

■ The first and most obvious indicia of a privacy expectation is ownership. *Wilson v. Health and Hospital Corporation of Marion City,* 620 F.2d 1201, 1212–1213 (CA 7, 1980). Dow's ownership of the Midland complex is undisputed. Ownership of property alone, however, is insufficient to claim an expectation of privacy. The owner must demonstrate that the premises were kept in a closed and secured condition. *Id.*

Dow cites the following measures as evidence that it has manifested and exhibited an expectation of privacy in its plant:

1. A chain-link fence at least 8 feet high installed completely around the production facility;

2. gates for ingress and egress at various intervals in the fence have an attendant (guard) on duty when any given gate is in operation to admit or allow people to leave the facility;

3. closed-circuit television surveillance for continuously monitoring the various entrance and exit gates and to monitor the area along the fence surrounding the facility;

4. alarm systems which will indicate unauthorized entry at various locations;

5. motion detectors at strategic locations to indicate movement of personnel in certain restricted areas within the facility;

6. roving patrols which travel throughout the facility and guard the perimeter to augment the other security systems;

7. liaison with local public law enforcement officials including radio communication to assist in the apprehension of persons engaged in unlawful activities relating to the production facility;

8. a requirement that employees entering the facility must exhibit an identification bade in every instance of entry;

9. a requirement that non-employees who wish to visit the facility must be approved and must obtain a visitors pass including a bade which must be exhibited at all times while in the facility;

10. a requirement that non-employees who have been approved to visit be greatly restricted in their movements and that some areas of the facility remain off-limits to all non-employees;

11. a requirement that *cameras by anyone other than an authorized representative of Dow are prohibited* at all times and in all places in the facility;

12. a requirement that persons visiting for technical reasons must obtain a technical pass which provides among other things that the visitor will not disclose any technical information learned as an incidence to his visit;

13. a staffing program such that security personnel are on duty twenty-four hours a day and seven days a week with at least twenty-five such people on duty at all times and with about fifty people on duty during normal duty hours;

14. a security budget whereby Dow spent at least 3.25 million dollars in each of the last ten years on the security of the Midland production facility; and

15. a disposal or drawings etc, that requires that, in the event the engineering drawings and/or blueprints of a specific production plant were to be disposed of, for example, at the conclusion of construction, the drawings and/or blueprints would be packaged and incinerated under the direction of security personnel who would also witness the incineration.

In addition, Dow points out that its employees and contractors sign secrecy agreements, and that its plant layout is designed in such a way that the more sensitive, proprietary areas are not visible to persons on the public right-of-way outside the fence. (Dow Brief at 11–12).

EPA responds to these assertions by arguing that Dow has sought only to restrict *access* to its plant and to protect its trade secrets from the eyes of its competitors, it has not attempted to conceal the *exterior* of its plant from view. Therefore, EPA main-

tains that Dow has failed to satisfy the first prong of *Katz.* This Court cannot agree.

As previously explained,[15] EPA's reference to the *exterior* of Dow's plant mischaracterizes what was actually captured in the aerial photographs. The photographs depict *internal* regions of the plant in such vivid detail, capable of further enlargement and magnification, as to defy simply being described as views of the *exterior* of the facility. When these photographic results are combined with the uncontroverted fact that Dow designed its plant so as to conceal the more sensitive, proprietary areas in the inner regions of the complex, EPA's position loses its persuasive weight.

The Court in *Katz,* 389 U.S. at 351–352, 88 S.Ct. at 511–512, specifically stated that what a person "seeks to preserve as private, *even in an area accessible to the public,* may be constitutionally protected." (emphasis added). Dow would never be able to show that it possesses a legitimate privacy expectation in its *entire* plant. Obviously, much of the plant is observable by the general public, both from the ground and from the air. But what is visible to the public are areas which Dow, either purposely or due to some commercial or architectural impracticability, has decided to allow the general public to see. Notwithstanding this common sense limitation, Dow may still possess an expectation of privacy with respect to *interior* regions of its facility.

The Fourth Amendment should not be read as to require the citizens or businesses of this nation to take unreasonable measures to protect themselves from surreptitious governmental searches. This Court is not prepared to conclude that Dow must build a dome over its entire plant before it can be said to have manifested or exhibited an expectation of privacy. *See United States v. Allen,* 633 F.2d 1282, 1289 (CA 9, 1980), *cert. denied,* —— U.S. ——, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981). Rather, what Dow "seeks to preserve as private," and then takes reasonable precautions to safeguard, is entitled to the protection of the Fourth Amendment. *Katz v. United*

15. *See* note 3 and accompanying text, *supra.*

*States, supra.* On this basis, the Court finds that Dow has satisfied the first prong of the *Katz* test.

### 2. Reasonableness of Dow's Privacy Expectation

The more difficult question to decide in this case is the second prong of *Katz*: whether Dow's expectation of privacy is one that society is prepared to accept as reasonable. EPA proposes several factors which should be considered in resolving this inquiry.[16] On the basis of these factors, EPA's position is that even if Dow has exhibited an expectation of privacy, it is not one that society accepts as reasonable.

Some of the factors proposed by EPA pertain either to the issue of whether Dow manifested a privacy expectation[17] or whether the "open fields" exception to the Fourth Amendment, *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), is applicable to this case.[18] Some of its suggested factors, however, do go to the question of reasonableness and therefore merit some discussion.

In describing the "type" and "nature" of the location observed as 2 factors to be considered, EPA argues that "it is hard to imagine anything larger or more conspicuous than a 2000 acre chemical manufacturing plant located in an urban area of a city." (EPA Brief at 20). As stated previously, the Court would agree that Dow could not possess a reasonable expectation of privacy in its *entire* plant. It may, however, exhibit such an expectation with respect to internal areas of the plant.

While not a Fourth Amendment case, the holding of the Fifth Circuit in *E.I. duPont de Nemours & Co. Inc. v. Christopher*, 431 F.2d 1012 (CA 5, 1970), *cert. denied*, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971), which the Supreme Court cited ap-

provingly in *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 n. 5, 94 S.Ct. 1879, 1883 n. 5, 40 L.Ed.2d 315 (1974), is instructive. *duPont* filed an action against a competitor, under Texas law, for using aerial surveillance and photography to obtain its trade secrets. In ruling in duPont's favor that aerial photography was an improper method of discovering trade secrets, the Court reasoned that:

> . . . we realize that industrial espionage of the sort here perpetrated has become a popular sport in some segments of our industrial community. However, our devotion to free wheeling industrial competition must not force us into accepting the law of the jungle as the standard of morality expected in our commercial relations. Our tolerance of the espionage game must cease when the protections required to prevent another's spying cost so much that the spirit of inventiveness is dampened. *Commercial privacy must be protected from espionage which could not have been reasonably anticipated or prevented.* We do not mean to imply, however, that everything not in plain view is within the protected vale, nor that all information obtained through every extra optical extension is forbidden. Indeed, for our industrial competition to remain healthy there must be breathing room for observing a competing industrialist. A competitor can and must shop his competition for pricing and examine his products for quality, components, and methods of manufacture. *Perhaps ordinary fences and roofs must be built to shut out incursive eyes, but we need not require the discoverer of a trade secret to guard against the unanticipated, the undetectable, or the unpreventable methods of espionage now available.*

> .    .    .    .    .

**16.** The factors proposed by EPA include:
    1. Lawfulness of Location From Which Observation was made
    2. Equipment Used to Make the Observation
    3. Type of Location Observed
    4. Nature of Objects or Activities Observed
    5. Efforts to Conceal Objects or Activities from View

    6. Frequency of Overflights

**17.** This is true of factors 3 through 6.

**18.** This is true of at least factors 1 and 2, and perhaps all of them. *See* Discussion, Section IV(D) *infra*.

To require DuPont to put a roof over the unfinished plant to guard its secret would impose an enormous expense to prevent nothing more than a school boy's trick. We introduce here no new or radical ethic since our ethos has never given moral sanction to piracy. The market place must not deviate far from our mores. *We should not require a person or corporation to take unreasonable precautions to prevent another from doing that which he ought not to do in the first place.* Reasonable precautions against predatory eyes we may require, but an impenetrable fortress is an unreasonable requirement, and we are not disposed to burden industrial inventors with such a duty in order to protect the fruits of their efforts. *Id.* at 1016–1017 (emphasis added).

This statement of policy reasons in support of a state tort law decision nonetheless provides guidance to the Court here. As in *duPont,* the present case also involves claims of trade secret appropriation. The rationale of *duPont* supports this Court's belief that commercial privacy may be expected and exhibited, and may be deemed reasonable and legitimate by society. Just as duPont need not be required to take "unreasonable precautions" to prevent aerial photography of its plant as a prerequisite to a tort action, likewise Dow should not be so required in order to claim the protection of the Fourth Amendment.

Society has spoken in this area through Congress, the State Legislatures, and the courts. Federal law, under the Trade Secrets Act, 18 U.S.C. § 1905, makes it a crime for government employees to disclose trade secret information. The Clean Air Act itself, in Section 114(c), 42 U.S.C. § 7414(c), addresses this concern for propriety information. Moreover, EPA has adopted regulations providing for protection of trade secrets. 40 CFR 2.201–2.309. Michigan law, in addition to recognizing a tort action, also makes it a crime to appropriate trade secrets, M.C.L.A. § 752.772, as well as to invade one's privacy by means of surveillance. M.C.L.A. §§ 750.539a–539b. These legislative and judicial pronounce-

ments are reflective of a societal acceptance of Dow's privacy expectation as reasonable.

There is some dispute in this case as to whether use of sophisticated aerial photography equipment constitutes visually enhanced surveillance.[19] Dow suggests that "a sophisticated aerial camera, in the hands of a government agent, is even more constitutionally repugnant than a telescope because it enables the searcher to permanently capture the image for later detailed study at leisure." (Dow Brief at 42). EPA, on the other hand, posits that this equipment captures nothing more than that which is already visible to the naked eye. (EPA Brief at 17–18; Transcript of oral argument at 29–32).

Having examined the photographs, the Court is unable to agree with EPA's position that "the camera can't see what the eye can't see." *Id.* On the contrary, when flying at 1,200 or 5,000 feet, the eye can discern only the basic sizes, shapes, outlines, and colors of the objects below. In this case, the finest precision aerial camera available was used to take the EPA photographs. The camera successfully captured vivid images of Dow's plant which EPA could later analyze under enlarged and magnified conditions. In doing so, the camera saw a great deal more than the human eye could ever see. The Court therefore would agree with Dow that the use of a sophisticated aerial camera is, at a minimum, on a par with other methods of visually enhanced surveillance in terms of its intrusiveness.

In *United States v. Taborda,* 635 F.2d 131 (CA 2, 1980), the Second Circuit was faced with the issue of whether observation by means of a high-powered telescope constituted the type of intrusion against which the Fourth Amendment protects. Consistent with *Katz,* the Court concluded:

. . . observation of objects and activities inside a person's home by unenhanced vision from a location where the observer may properly be does not impair a legitimate expectation of privacy. However, *any enhanced viewing of the interior of a*

---

**19.** *supra* note 2.

*home does impair a legitimate expectation of privacy and encounters the Fourth Amendment's warrant requirement*, unless circumstances create a traditional exception to that requirement. *Id.* at 139 (emphasis added). *See also United States v. Kim*, 415 F.Supp. 1252, 1254–1256 (D.Hawaii, 1976). Since the present case involved an intrusion into the *interior* of Dow's plant, as the Court has previously defined that term, the enhanced viewing in this case similarly encounters the Fourth Amendment's warrant requirement.

■ Turning the question of "reasonableness" around for a moment—i.e. looking at the reasonableness of the government's actions—it is likely that society would view many forms of visually enhanced surveillance by the government as unreasonable. This is particularly so when it is used in a non-criminal context. *See United States v. Bailey*, 628 F.2d 938, 944 (CA 6, 1981). In this age of ever-advancing and potentially unlimited technology the government should be made aware that it does not possess carte blanche authority to utilize sophisticated surveillance methods to keep watch over citizens or businesses not suspected of any criminal activity. As the government's arsenal of technologically-advanced surveillance equipment expands, so too the protections of the Fourth Amendment should broaden in response. *United States v. Holmes*, 521 F.2d 859, 866 (CA 5, 1975), *United States v. Kim*, 415 F.Supp. at 1257.

The Court is reminded of the powerfully eloquent dissent of Justice Douglas in *United States v. White*, 401 U.S. 745, 756, 760–761, 91 S.Ct. 1122, 1128, 1130–1131, 28 L.Ed.2d 453 (1971):

Electronic surveillance is the greatest leveler of human privacy ever known. How most forms of it can be held 'reasonable' within the meaning of the Fourth Amendment is a mystery. To be sure, the Constitution and Bill of Rights are not to be read as covering only the technology known in the 18th century. Otherwise its concept of 'commerce' would be hopeless when it comes to the management of modern affairs. At the same time the concepts of privacy which the Founders enshrined in the Fourth Amendment vanish completely when we slavishly allow an all-powerful government, proclaiming law and order, efficiency, and other benign purposes, to penetrate all the walls and doors which men need to shield them from the pressures of a turbulent life around them and give them the health and strength to carry on.

. . . Electronic aids add a wholly new dimension to eavesdropping. They make it more penetrating, more indiscriminate, more truly obnoxious to a free society. Electronic surveillance, in fact, makes the police omniscient; and police omniscience is one of the most effective tools of tyranny.

These same concerns are not entirely absent from this case. While the EPA did not engage in any form of "Star Wars" surveillance, and only used equipment which was commercially available, if this warrantless investigatory method is countenanced in this case, where will courts draw the line? In this regard the Court finds merit in the language of *Dean v. Superior Ct.*, 35 Cal. App.3d 112, 110 Cal.Rptr. 585, 588–589 (1973):

Expectations of privacy are not earthbound. The Fourth Amendment guards the privacy of human activity from aerial no less than terrestrial invasion. At a recent but relatively primitive time, an X–2 plane could spy on ground activities from a height of 50,000 feet. Today's sophisticated technology permits overflights by vehicles orbiting at an altitude of several hundred miles. Tomorrow's sophisticated technology will supply optic and photographic devices for minute observations from extended heights. Judicial implementations of the Fourth Amendment need constant accommodation to the ever-intensifying technology of surveillance. In analyzing claims of immunity from aerial surveillance by agents of government, the observer's altitude is a minor factor. Horizontal extensions of the occupant's terrestrial activity

form a more realistic and reliable measure of privacy than the vertical dimension of altitude ... Reasonable expectations of privacy may ascend into the airspace and claim Fourth Amendment protection.

The conclusion of this brief turn-around of the "reasonableness" question is that a society which views certain forms of visually enhanced governmental surveillance as *unreasonable*, would likely accept as *reasonable*, Dow's expectation to be free from this form of intrusion.

A final argument raised by EPA, which, at first blush, is not without a good deal of merit, is that the public interest in effective pollution control outweighs any privacy expectation which Dow may have. *United States v. Martinez-Fuerte*, 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). In this regard EPA emphasizes the utility of warrantless aerial overflights and photography as a tool to monitor compliance with the federal pollution laws.

All of us certainly recognize the need for aggressive and effective pollution control. In this regard we, as citizens, certainly desire EPA to possess all the tools necessary to carry out its legislative mandate to effectuate and enforce the federal pollution laws. For 2 reasons, however, EPA's "public interest—pollution control" argument does not outweigh Dow's expectation of privacy under the facts of this case.

First, the Court finds very little pollution control utility in the investigatory method used by EPA in this case. EPA asserts that it had 2 purposes for the overflight: to get photographs of the "general layout of the plant in relation to the power houses," and to confirm "excess emissions from the power houses." (EPA Brief at 21). The facts are uncontroverted, however, that Dow had earlier given schematic drawings of the power houses to EPA voluntarily. EPA could have made further requests for similar drawings, maps, or even photographs, of the general layout from Dow. Furthermore, it is difficult to place credence in EPA's assertion that a goal of the aerial photography was to confirm excess emissions. EPA had little or no control over

when the photographs would be taken by Abrams, and no knowledge of whether there would be any emissions at the moment they were taken.

A second reason militating against EPA's position is that it is difficult to justify a need for the agency to conduct *warrantless* aerial searches. It appears to the Court that *at a minimum*,[20] an *ex parte* warrant procedure would best strike the balance between Dow's expectation of privacy and EPA's asserted need to conduct surprise inspections of this sort. *See generally Note, Rationalizing Administrative Searches*, 77 Mich.L.Rev. 1291, 1329 n. 184 (1979). As well stated by one commentator, "since the normal inspection procedure for *EPA* requires some advance preparation and advance decisions concerning which facilities to inspect, the additional step of obtaining a search warrant does not seem to be a tremendous burden in light of the constitutional rights involved." Martin, *EPA and Administrative Inspections*, 7 Fla. St.L.Rev. 123, 130 (1979); *see also EPA Memorandum on Inspection Procedures*, 41 Envir.Rep. (BNA) 2451, 2452 (April 11, 1979).

In terms of policy considerations, the public interest in governmental compliance with constitutional and statutory provisions is also involved in this case. *United States v. Martinez-Fuerte, supra.* This consideration would appear to lend support to Dow's assertion that its privacy expectation is one which society is prepared to accept as reasonable.

For all these reasons, the Court finds that Dow has exhibited an actual expectation of privacy, and that that expectation is one the society is prepared to recognize as reasonable. Therefore, under a *Katz* analysis, the Court again concludes that EPA's aerial photography of Dow's plant constituted an unreasonable search in violation of the Fourth Amendment.

### D. "Open Fields?"

In *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924) the Supreme Court held that "the special pro-

---

**20.** *See* n. 27 *infra*

tection accorded by the Fourth Amendment . . . is not extended to the open fields." In other words, a visual observation of something in plain view—*i.e.* observable by members of the public—does not constitute a search within the meaning of the Fourth Amendment.[21] This ruling was followed in *Air Pollution Variance Bd. v. Western Alfalfa Corp.*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), which involved a constitutional challenge to a health inspector's warrantless observation of "plumes of smoke being emitted from . . . chimneys" on the premises of a corporation. *Id.* at 863, 94 S.Ct. at 2115. The Court held that, "the field inspector did not enter the plant of offices . . . He had cited what anyone in the city who was near the plant could see in the sky—plumes of smoke . . . [therefore] he was well within the 'open fields' exception . . . approved in Hester." *Id.* at 864–865, 94 S.Ct. at 2115–2116.

EPA asserts that the "open fields" exception applies in this case and therefore validates its actions. In addition to the foregoing authority, EPA cites 2 recent federal cases, *United States v. Allen*, 633 F.2d 1288 (CA 9, 1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981), and *United States v. DeBacker*, 493 F.Supp. 1078 (WD Mich., 1980), and 9 state cases [22] in support of its position. This Court finds the cases cited either distinguishable or nondispositive, and concludes that the "open fields" exception does not apply in this case.

In *United States v. Oliver*, 657 F.2d 85 (CA 6, 1981), the Sixth Circuit relying upon the rationale of *Katz*, held that "the 'open fields' exception to the warrant requirement can no longer be automatically invoked to validate a warrantless search and seizure . . ." *Id.* at 87–88. The Court explained that "*Katz* shifted the emphasis of the test [for determining the legality of a warrantless search] from an inquiry into commonlaw property distinctions to an inquiry in which the . . . reasonable expectations of privacy became the focal point." *Id.* It then concluded that:

> . . . Oliver's expectation of privacy was objectively reasonable. *Society's interest in law enforcement is not unduly hampered by requiring a warrant prior to searching a private field which has been reached through a private road exhibiting several "No Trespassing" signs and blocked by a locked gate*, unless there is an imminent threat of destruction of the evidence or there exists a high probability that the evidence will cause serious bodily harm. We are presented with no such emergency situation here.

*Id.* at 87. (emphasis added). *See also United States v. Mullinex*, 508 F.Supp. 512, 514 (ED Ky., 1980).

The Court has already found that Dow's expectation of privacy was objectively reasonable. In accordance with *Oliver*, therefore, society's interest in the enforcement of pollution laws is not unduly hampered by requiring a warrant prior to EPA's aerial search of a private manufacturing plant which is reasonably secured, especially after EPA is specifically refused entry.

Other factors take this case out of the "open fields" exception as well. As previously stated, the exception has the effect of making a plain view observation a nonsearch. Such a result, however, would be anomalous in this case. EPA has already admitted that it was engaged in a "search" and a "quest for evidence."[23] Therefore,

**21.** The "plain view" doctrine of *Coolidge v. New Hampshire*, 403 U.S. 433, 464–468, 91 S.Ct. 2022, 2037–2039, 29 L.Ed.2d 564 (1971) is not involved in this case. That doctrine is not a justification to search, but a reason to extend an otherwise valid search. *See Wilson v. Health and Hospital Corporation of Marion City*, 620 F.2d 1201, 1209 (CA 7, 1980).

**22.** *People v. St. Amour*, 104 Cal.App.3d 886, 163 Cal.Rptr. 187 (1980); *People v. Lashmett*, 71 Ill.App.3d 429, 27 Ill.Dec. 657, 389 N.E.2d 888 (1979); *Burkholder v. Superior Court*, 96 Cal.App.3d 421, 158 Cal.Rptr. 86 (1979); *State v. Brighter*, 589 P.2d 527 (Haw.1979); *State v. Stachler*, 570 P.2d 1323 (Haw.1977); *Plunkett v. City of Lakewood*, 2 Civ. 49610 (unreported decision filed Nov. 15, 1977, Cal.Ct.App.2d Dist.), *cert. denied* 436 U.S. 945, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *People v. Superior Court*, 37 Cal.App.3d 836, 112 Cal.Rptr. 764 (1974); *Dean v. Superior Ct.*, 35 Cal.App.3d 112, 110 Cal.Rptr. 585 (1973).

**23.** *See* note 4 and text accompanying, *supra*.

the question before this Court is really limited to whether that admitted search was *unreasonable* under the Fourth Amendment.

The Court has already described why it finds that the EPA aerial photographs "more closely approximate a view of the *interior* of the plant than the *exterior.*"[24] This distinction is relevant to the "open fields" inquiry. *See Wilson v. Health & Hospital Corporation of Marion City,* 620 F.2d 1201, 1210 (CA 7, 1980). EPA was able to observe a great deal more than "what anyone in the city who was near the plant could see," *Air Pollution Variance Bd., supra,* in its detailed aerial photographs. Granted, other aircraft fly in the vicinity of the Dow plant on occasion. The persons in those aircraft are likely able to observe Dow's plant below. But it is unlikely that those persons are able to see minute, internal details of the plant, without the type of equipment used by EPA.

One commentator, writing specifically about this case, made the following observation:

> The recently filed Dow Chemical case against EPA seems to involve a fact situation where the open fields exception may have some applicability. However, aerial surveillance would seem to push the exception too far. Although *E.I. duPont de Nemours and Co. Inc. v. Christopher,* 431 F.2d 1012 (5th Cir., 1970), *cert. denied* 400 U.S. 1024 [91 S.Ct. 581, 27 L.Ed.2d 637,] *rehearing denied,* 401 U.S. 967 [91 S.Ct. 968, 28 L.Ed.2d 250] (1971), involved industrial espionage carried out by means of aerial surveillance, what the court said there would seem to apply at least in spirit to the Dow Chemical case:

> [We] realize that industrial espionage of the sort here perpetrated has become a popular sport in some segments of our industrial community. However, our devotion to free wheeling industrial competition must not force us into accepting the law of the jungle as the standard of morality expected in our commercial relations.

431 F.2d at 1016. The important question that has to be faced is what is constitutionally offensive scrutiny. It would be fallacious to extend the open fields exception to the facts in *Dow* because if it were, advanced technology has given us microphones and cameras that can make an enclosed room an "open field." Spatially based criteria of eligibility for fourth amendment protection ignore the pertinent question as to what it is we wish to see preserved from the offensive scrutiny.

Martin, *EPA and Administrative Inspections,* 7 Fla.St.L.Rev. 123, 134 n. 50 (1979). This viewpoint is in accord with the holding of *United States v. Oliver, supra,* and this Court's factual findings under *Katz. See also United States v. Taborda,* 635 F.2d 131, 139 (CA 2, 1980).

The federal cases cited by EPA do not control this case.[25] While both involved aerial surveillance, both are legally and factually distinguishable. In *United States v. Allen,* 633 F.2d 1282, 1290 (CA 9, 1980), *cert. denied,* —— U.S. ——, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981), the Court found that "the defendants did not have a reasonable expectation (of privacy)" due to the following factors:

> ... The Allen Ranch is virtually on the United States sea-coast border ... and

---

**24.** *See* note 3 and text accompanying, *supra.*

**25.** Neither do the state cases. *supra* note 22. All of the cases involved aerial observation of contraband. The Sixth Circuit has stated that, "for Fourth Amendment purposes, there is a clear distinction between contraband and other property." *United States v. Bailey,* 628 F.2d 938, 944 (CA 6, 1980); *but see United States v. Taborda,* 635 F.2d 131, 138–139 n. 10 (CA 2, 1980). The Court has no quarrel with the holding of these cases that, as a general proposition of law, "a subjective desire to hide contraband from aerial surveillance is not sufficient to establish the requisite reasonable expectation of privacy." *People v. St. Amour,* 163 Cal.Rptr. at 191. As applied to the facts of this non-criminal case, however, that proposition cannot withstand constitutional scrutiny. Rather, this case fits within the holding that, "in order to be constitutionally protected from overflights, the person must show that the land in question is expected to be private according to the common habits of persons engaged in [business]." *Id.* Clearly, Dow has made such a showing.

Coast Guard helicopters routinely traversed the nearby air space for several reasons, including law enforcement. The residents of the Allen Ranch would, no doubt, have been aware of these routine flights and any reasonable person, cognizant of the ranch's proximity to the coastline and the Coast Guard's well-known function of sea-coast patrol and surveillance, could expect that government officers conducting such flights would be aided by sophisticated electronic equipment. As such, *the residents could not reasonably bear a subjective expectation of privacy from the Coast Guard's airborne telephotographic scrutiny*, particularly where, as here, the objects observed were large scale modifications of the Allen Ranch landscape and barn. *Id.* (emphasis added). Further discussion of *Allen* is unnecessary. Likewise, *United States v. DeBacker*, 493 F.Supp. 1078 (WD Mich., 1980) is also distinguishable. There the Court found that, "defendant's relatively minor expectations of privacy do not outweigh the value to society in permitting such non-intrusive surveillance." *Id.* at 1081. Unlike this case, the aerial observation in *DeBacker* was unenhanced by visual aids such as a sophisticated camera. Also, the Court specifically noted that "airplane flights over local farm lands at low altitudes (200 feet) are not infrequent..." *Id.* The same cannot be said of flights over Dow's chemical manufacturing facility. *Accord, United States v. Mullinex*, 508 F.Supp. 512, 514–515 (ED Ky., 1980).

For these reasons, the Court finds that the "open fields" exception neither takes this case out of the purview of the Fourth Amendment, nor in any way alters this Court's earlier conclusion that EPA's conduct was unreasonable thereunder.

## FIFTH AMENDMENT

■ Dow has summarized its Fifth Amendment claim as follows: "that the surreptitious reconnaissance flights over Dow's Midland plant ..., together with the photographs taken of the plant by EPA and its contractor constitute a taking of property [*i.e.* trade secrets and other proprietary information] without due process of law." (Dow Response Brief at 2). On various factual and jurisdictional grounds, EPA has moved for summary judgment on this claim.

In its Reply Brief EPA states that it does "not disagree with Dow's assessment that disputed issues of fact still remain with regard to the question of whether Dow in fact has any trade secrets and whether any such trade secrets are discernable in the aerial photographs obtained by EPA ..." (EPA Reply Brief at 8). For this reason, the Court hereby ·DENIES EPA's motion for summary judgment on this claim. F.R. Civ.P. 56(c) [26]

## CLEAN AIR ACT

■ Dow has raised 2 separate statutory sub-issues in this case: first, whether EPA is authorized under Section 114 of the Clean Air Act, 42 U.S.C. § 7414, to use aerial photography as an investigation tool; and second, whether EPA's sole and exclusive remedy when refused entry is to seek injunctive relief under Section 113 of the Clean Air Act, 42 U.S.C. § 7413. EPA's position is that Section 114 implicitly authorizes it to use aerial photography. EPA

---

**26.** As the Court reads the complaint regarding the Fifth Amendment claim, the following material facts, as alleged by Dow, are still in dispute:

1) Dow has protectable trade secrets in its Midland plant and consequently, Dow has exercised the necessary reasonable degree of secrecy for the protection of such trade secrets.

2) The photographs taken by the EPA in its aerial surveillance of the Dow facility gave the EPA possession of valuable trade secrets of Dow.

3) Photographs taken by the EPA through aerial reconnaissance are available to the public and hence, will lead to a disclosure and loss of Dow trade secrets.

The Court rejects EPA's claim that it lacks subject matter jurisdiction to issue the declaratory and injunctive relief sought by Dow. The Court is vested with such jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. § 702, and 28 U.S.C. §§ 2201–2202. *See e.g. Public Service Co. of Indiana v. U.S.E.P.A.*, 509 F.Supp. 720, 721 (SD Ind., 1981).

also contends that the agency is not required to seek injunctive relief when entry is refused, and need only secure an *ex parte* warrant. The Court finds that only the former question—as to EPA's authority under Section 114—is ripe for decision in this case.[27] Therefore the Court will leave the latter issue for another day.

### A. Use of Aerial Photography

Section 114 of the Clean Air Act, 42 U.S.C. § 7414, governs the authority of EPA to enter and conduct inspections of emissions sources. In relevant part, Section 114 provides:

(a) For the purpose ... (ii) of determining whether any person is in violation of any such standard or any requirement of such a plan, or (iii) carrying out any provision of this chapter

(2) the Administrator or his authorized representative, upon presentation of his credentials—

(A) shall have a right of entry to, upon or through any premises of such person or in which any records required to be maintained under paragraph (1) of this section are located, and

(B) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under paragraph (1) and sample any emissions which such person is required to sample under paragraph (1).

This statute *expressly* authorizes EPA to enter a facility to determine whether the applicable Clean Air Act requirements are being complied with, to have access to records and reports, to inspect any emissions monitoring equipment, and to sample emissions. The question before the Court in this case is what *implied* authority is granted to EPA under the statute.[28]

EPA asserts that where Congress has delegated broad authority to an agency to implement a statute, such delegation carries with it the implicit authority for the agency to use all means and measures to effectuate the legislatively mandated end. *American Trucking Assoc. v. United States*, 344 U.S. 298, 308–313, 73 S.Ct. 307, 313–316, 97 L.Ed. 337 (1952). Dow responds that the legislative scheme established in the Clean Air Act is expressly and narrowly tapered to consist primarily of self-reporting and consented-to inspections.

As intimated previously, this Court believes that EPA should be granted broad authority to carry out its legislative mandate to enforce the federal pollution laws. Congress recognized this need when it amended the Clean Air Act in 1970:

The purpose of the legislation ... is to speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again. The Air Quality Act of 1967 (Public Law 90–148) and its predecessor acts have been instrumental in starting us off in this direction. A review of achievements to date, however, make abundantly clear that the strategies which we have pursued in the war against air pollution have been inadequate in several important respects, and the methods employed in implementing those strategies often have been slow and less effective than they might have been.

---

**27.** Under the facts of this case, an "actual controversy" regarding the Section 113 issue has not been presented within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201. *See Lake Carriers Assoc. v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972). Had EPA secured, or even attempted to secure, an *ex parte* warrant prior to the flyover, the issue would be justiciable. The agency, however, did neither. Coincidentally, this very issue is about to be decided by the United States Court of Appeals for the Sixth Circuit in *United States v. Stauffer Chemical Co.*, no. 81–5311 (oral argument held December

17, 1981). The Appeal in *Stauffer Chemical* is from a District Court decision holding that the Clean Air Act authorizes EPA to use an *ex parte* warrant procedure when entry to inspect is refused. 511 F.Supp. 744, 749–750 (MD Tenn., 1981).

**28.** At the outset EPA maintains that its actions did not constitute an "entry." This Court agrees. The real issue, however, is not whether the aerial surveillance constituted an entry, but whether Section 114 authorizes EPA to use overflights as an investigatory tool.

H.R.Rep.No. 91–1146, 91st Cong. 2d Sess. 116, *reprinted in* [1970] U.S.Code Cong. & Ad.News 5356. Despite this recognition and statement of purpose, Congress did not amend the statute to authorize EPA to use "all means and measures" to monitor and enforce compliance with the Act.

Nothing in the plain language of the statute, or its sparse legislative history, suggests that Congress intended that EPA be given authority to utilize aerial surveillance and photography. In fact, 3 literal aspects of Section 114 reveal a legislative will that EPA's investigatory powers be limited to land-based examination of emission sources.

Section 114(a)(2)(A) grants to EPA, or its "authorized representative": [29]

—a right of entry;

—to, upon, or through any premises;

—upon presentation of credentials.

An analysis of each of these phrases compels the conclusion that aerial surveillance and photography by EPA is not authorized under the statute, even by reasonable implication.

A "right of entry" cannot be viewed as synonomous with a "right to search." Had Congress intended that EPA be allowed to use aerial search techniques, it could have considered granting the agency a broad "right to search," or could have specifically enumerated aerial surveillance as among the permissible methods of monitoring and inspection. But a "right of entry," in literal terms, is something quite different. The noun "entry" denotes the physical act of admission or ingress into a given area. The fact that Congress used the phrase "right of entry," suggests to this Court a common sense interpretation, leading to the conclusion that EPA's intended inspection authority is land-based.

The phrase "to, upon or through any premises," further defines the nature of EPA's statutory right of entry. In conjunction with the term "entry," the adverbs "to, upon, or through" more logically reveal that

Congress had in mind an earthbound inspection scheme for EPA, rather than one from above looking down.

Finally, it would be paradoxical for this Court to find an implied right to use *surreptitious* overflights, in a statute expressly requiring the "presentation of . . . credentials" by the inspecting EPA official. The Court is not prepared to ratify a procedure whereby an EPA official appears at the gate of a facility, presents his credentials, and then directs the inspected party's attention to the aircraft flying overhead. Again, this clear legislative expression supports the conclusion that EPA exceeded its statutory authority under Section 114 in carrying out the flyover and aerial photography of Dow's plant.

EPA relies on 2 recent cases, *In Re Clean Air Act Inspection of Bunker Hill*, 15 ERC 1063 (D Idaho, 1980), *affirmed sub. nom, Bunker Hill Co. v. U.S.E.P.A.*, 658 F.2d 1280 (CA 9, 1981) and *Public Service Co. of Indiana Inc. v. U.S.E.P.A.*, 509 F.Supp. 720 (SD Ind., 1981), for the proposition that "EPA's implicit authority to take photographs of a facility . . . necessarily arises out of its explicit authority in Section 114 of the Act." (EPA Brief at 32–33). EPA's position, and the authority on which it relies, are sound. Section 114 can and should be read as impliedly authorizing the use of photography of a facility which is the subject of an *on-site* inspection. Neither Section 114, nor the cases cited, however, impliedly authorize surreptitious *aerial* photography.

Both the *Bunker Hill* and *Public Service Company* cases involved the taking of photographs during on-site, land-based inspections by EPA. In separate conclusions of law the Court in *Bunker Hill* held that:

10. The Environmental Protection Agency has authority under Section 114 of the Clean Air Act to take photographs of the facilities and equipment it inspects.

---

**29.** No issue has been raised in this case as to whether Abrams was EPA's "authorized representative." *See e.g. Bunker Hill v. U.S.E.P.A.*, 658 F.2d 1280 (CA 9, 1981); *Stauffer Chemical Co. v. E.P.A.*, 647 F.2d 1075 (CA 10, 1981);

*United States v. Stauffer Chemical Co.*, 511 F.Supp. 744 (MD Tenn., 1981), appeal docketed no. 81–5311 (CA 6, May 4, 1981); *Public Service Co. of Indiana v. U.S.E.P.A.*, 509 F.Supp. 720 (SD Ind., 1981).

11. The Bunker Hill Company cannot require the Environmental Protection Agency or its private contractors duly authorized as representatives of the EPA Administrator to submit film to Bunker Hill for development and screening for possible confidentiality concerns. The Bunker Hill Company may, however, claim that any or all of the information depicted in photographs taken by EPA during a Section 114 inspection is confidential, and secure to such photographs the protections provided by 40 CFR 2.201 et seq.

15 ERC at 1066. Similarly, in *Public Service Company*, a decision limited to its own facts, the Court held that EPA's taking of photographs to pinpoint and cite violations was "not improper." 509 F.Supp. at 726. This Court agrees with these holdings, but finds that they are not dispositive of the issue in this case.

Aerial surveillance and photography is not authorized, either expressly or impliedly, by Section 114 of the Clean Air Act. To find otherwise would be to undermine the apparent Congressional purpose that only land-based inspections be utilized, to negate the specific requirement that EPA inspectors present their credentials at the time of the inspection, and to circumvent the inspected parties' right to state claims of confidentiality. 42 U.S.C. § 7414(c); 40 CFR 2.201 et seq.

V. *Conclusion*

In summary, the Court concludes that the EPA flyover and aerial photography of Dow's plant constituted an unreasonable search in violation of the Fourth Amendment. In addition, the Court finds that EPA exceeded its statutory authority under Section 114 of the Clean Air Act, 42 U.S.C. § 7414, in using this method of inspection.

Accordingly, the Court hereby GRANTS Dow's motion for partial summary judgment and DENIES EPA's cross-motion for summary judgment. On this basis;

IT IS HEREBY ORDERED AND ADJUDGED that EPA is permanently enjoined and restrained from conducting future aerial surveillance and photography of the Dow Chemical manufacturing facility in Midland, Michigan.

IT IS SO ORDERED.