**DOW CHEMICAL COMPANY, Plaintiff-Appellee,**

v.

**UNITED STATES of America, By and Through Anne M. BURFORD, Administrator, Environmental Protection Agency, Defendant-Appellant.**

**No. 82–1811.**

United States Court of Appeals, Sixth Circuit.

Argued July 12, 1984.

Decided Nov. 9, 1984.

---

Jose R. Allen, Anne S. Almy (argued), Dirk D. Snel, Environmental Defense Section, Land and Natural Resources Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Jane Gootee (argued), Bernd W. Sandt, Legal Dept., Dow Chemical Co., Midland, Mich., for plaintiff-appellee.

Steven D. Ellis, Mountain State Legal Foundation, Denver, Colo., amicus curiae.

Before LIVELY, Chief Judge, MERRITT, Circuit Judge, and HORTON, District Judge.*

MERRITT, Circuit Judge.

In investigating Dow Chemical Company for possible violations of the Clean Air Act, the Environmental Protection Agency caused aerial photographs of Dow's 2000-acre Midland, Michigan plant to be made by a private aerial survey company. Upon learning of the EPA flyover, Dow sought declaratory and injunctive relief in the United States District Court for the Eastern District of Michigan. On cross-motions for partial summary judgment, the District Court held that EPA's detailed aerial photography was an unreasonable search and seizure under the Fourth Amendment. The District Court, 536 F.Supp. 1355, permanently enjoined EPA from conducting future aerial surveillance and photography of Dow's Midland, Michigan plant. We hold that the photographic flyover did not constitute a Fourth Amendment search and was not outside the EPA's statutory authority.

## I.

The EPA began an investigation of Dow's Midland, Michigan plant during the latter part of 1977. The investigation focused on whether emissions from two coal-

---

* The Honorable Odell Horton, Judge of the United States District Court for the Western District of Tennessee, sitting by designation.

burning power houses violated the federal air quality standards established under the Clean Air Act.

On September 9, 1977, EPA made an on-site inspection of Dow's power plants. EPA later requested and received from Dow schematic drawings depicting both the physical layout of the power houses and the boilers and turbines within the power houses. EPA then called Dow to arrange a second inspection. Dow refused to grant entry for this inspection upon hearing that EPA inspectors planned to take photographs of the plant. After being denied entry, EPA informed Dow that it would consider seeking a search warrant to gain access to the plant.

EPA did not secure a warrant; instead, on February 6, 1978, EPA contracted with Abrams Aerial Survey Corporation, a private company located in Lansing, Michigan, to take aerial photographs of the Dow plant. EPA's stated purposes for the aerial surveillance were to create visual documentation of smokestack emissions and to obtain perspectives on the layout of the plant and its relationship to the surrounding geographic area. EPA directed Abrams to take the pictures at particular altitudes and angles; EPA informed Abrams that emissions would be more visible in early morning or late afternoon, but left the actual time of the flight to Abrams' discretion.

Abrams performed the overflight in the afternoon on February 7, 1978. The aircraft made at least six passes over the plant at altitudes of 12,000, 3,000, and 1,200 feet. Abrams used a Wild RC-10 aerial mapping camera to take approximately 75 color photographs of various parts of the Dow plant. Because of Abrams' sophisticated photographic equipment, the photographs contain vivid detail and resolution; some of the photographs can be enlarged to a scale of 1 inch equals 20 feet or greater, without significant loss of detail or resolution. The District Court found that when enlarged in this manner and viewed under magnification, the photographs show equipment, pipes and power lines as small as ½ inch in diameter.

EPA did not notify Dow either before or after the flight. When Dow learned of the event a few weeks later, from sources other than EPA, Dow filed this action.

The District Court reasoned that once it is established that an administrative search occurred, "[t]he question [turned] on whether EPA's authority under the Clean Air Act meets 'the sufficiently comprehensive and defined' criteria of Donovan v. Dewey ... or whether the search violated a reasonable expectation of privacy." 536 F.Supp. at 1360. The District Court concluded that Marshall v. Barlow's, Inc., 436 U.S. 307, 313, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978), controlled the present case, and that an administrative search requires a warrant, unless the search falls into one of several narrow and well-defined exceptions to the warrant requirement. In the District Court's view, EPA's search of Dow's chemical plant did not fit any of these exceptions. Hence, the Court found that EPA's aerial photography of Dow's Midland plant was an unreasonable search proscribed by the Fourth Amendment.

Although the Court "[was] fairly certain that the Fourth Amendment issue raised in this case is properly resolved on the basis of an administrative inspection analysis alone," 536 F.Supp. at 1363, nevertheless, it considered it useful to "alternately review the facts [in Dow ] under the framework of Katz." Id. According to the District Court, the search of Dow's Midland plant was unreasonable because EPA's aerial photography invaded Dow's reasonable expectation of privacy in the "interior regions of its plant"—meaning by this phrase, the open, outdoor spaces between plant buildings. The Court concluded that the photographic equipment used by EPA's agents constituted "enhanced viewing" that invaded Dow's reasonable expectation of privacy in these outdoor regions. Additionally, the search was unreasonable because EPA's needs in preventing pollution, though legitimate, were outweighed by Dow's reasonable expectation of privacy.

Lastly, the District Court held that the Clean Air Act did not authorize EPA to institute aerial surveillance of chemical plants. Hence, by conducting such surveillance, EPA exceeded its statutory authority under the Act.

Therefore, two questions are presented by this appeal. First, we must decide the constitutional issue of whether there was an unreasonable search under the Fourth Amendment. Second, did EPA exceed its statutory authority under the Clean Air Act by conducting the aerial photography?

## II.

The Fourth Amendment provides for "people to be secure in their persons, houses, papers and effects against unreasonable searches ... and [that] no warrant shall issue but upon probable cause ...." U.S. CONST. amend. IV. The U.S. Supreme Court held nearly twenty years ago that these protections apply, at least in part, when a governmental agency conducts an administrative search of a commercial facility. *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). More recently, in *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the Court clarified the law concerning administrative searches and held that when government action constitutes a Fourth Amendment "search," the agency must get an administrative warrant, or, subject to certain exceptions, the search will be deemed unreasonable.[1] If the government action in this case—EPA's aerial photography of Dow Chemical's Mid-

land, Michigan plant—constitutes a Fourth Amendment "search," then *Barlow's* controls, and EPA's warrantless search violated Dow's Fourth Amendment rights. If, on the other hand, the aerial photography was not a search, then EPA's aerial observation did not violate the Fourth Amendment. The question before this court then is whether EPA's aerial photography was sufficiently intrusive to constitute a "search" triggering the warrant clause of the Fourth Amendment.

■ The issue of whether there was a search is a threshold requirement of Fourth Amendment analysis. To be entitled to Fourth Amendment protection, it is first necessary to determine whether there was a "search," a term of art with special constitutional significance. Traditionally, in defining what constituted a search, the Supreme Court interpreted the Fourth Amendment as primarily protective of property rights; a trespass was a necessary condition for determining whether a search had occurred. *See Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). The Supreme Court modified this property based concept in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *Katz* defines what constitutes a search with a two-prong test: first, the person claiming Fourth Amendment protection must prove that he or she had an actual, or a subjective, expectation of privacy in the area intruded upon by the government. Second, that subjective expectation must be one that society would deem reasonable. The *Katz* doctrine therefore protects an individ-

---

1. Exceptions to the *Barlow's* administrative warrant requirement have been made in industries like the alcoholic beverage industry, which has long been "subject to close supervision and inspection." *Colonnade Corp. v. United States,* 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970), and the firearms industry, which has also been subject to pervasive and comprehensive government regulation. *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). Implicit in these exceptions to the warrant requirement is the notion of implied consent. Another exception has been carved out when a statute, by explicitly requiring a

warrantless search, "establishe[d] a predictable and guided federal regulatory presence." *Donovan v. Dewey,* 452 U.S. 594, 604, 101 S.Ct. 2534, 2541, 69 L.Ed.2d 262 (1981) (Supreme Court upholds constitutionality of section 103(a) of the Mine Safety and Health Act requiring that mine safety inspectors make warrantless searches). Inherent in this exception is a test that balances the strength of the federal regulatory interest, on the one hand, with the reasonable expectation of privacy of the commercial entity on the other. The government has not argued for the application of any of these exceptions to this case.

ual's actual privacy interest when that interest is reasonable. In the instant case, we must determine whether the government's aerial photography of Dow's Midland plant intruded upon Dow's actual and reasonable expectation of privacy in the spaces between its buildings, or in the words of the District Court, "in the interior regions of its plant."

Before applying the *Katz* analysis to this case, it is important to note that the word "reasonable" is used in Fourth Amendment analysis in two different ways, and that these two ways must be separated in order to avoid confusion. A "reasonable search" is different from a "reasonable expectation of privacy." The former refers to whether "probable cause" existed or whether the officers exceeded the limits of the warrant. The latter determines whether there was a Fourth Amendment "search" at all and focuses on whether the human relationships that normally exist at the place inspected are based on intimacy, confidentiality, trust or solitude and hence give rise to a "reasonable" expectation of privacy. The District Court may have confused or conflated these two when it stated that it "[was] fairly certain that the Fourth Amendment issue raised in this case is properly resolved on the basis of an administrative inspection analysis alone" without reference to an analysis under *Katz.* 536 F.Supp. at 1363. But in order for an administrative inspection to trigger the Fourth Amendment, there must be a search in the constitutional sense of that term. Hence, *Katz* must be discussed for *Katz* defines in terms of privacy interests what a search is for Fourth Amendment purposes.

### III.

Establishing an actual expectation of privacy requires two elements. First, it must be established what a person had an expectation of privacy *in,* for example, a home, office, phone booth or airplane. Second, it must be established what the person wanted to protect his privacy *from,* for example, non-family members, non-employees of a firm, strangers passing by on the street or flying overhead in airplanes. The New York Stock Exchange, a place which illustrates the two types of expectations, permits only members and employees on the floor but welcomes the public observer from above.

A useful test of whether a person has a privacy interest in a certain place is whether there are any "objective manifestations of any claimed privacy expectation." *Dow Chemical Co. v. United States,* 536 F.Supp. 1355, 1364 (E.D.Mich. 1982). *See also United States v. Taborda,* 635 F.2d 131, 137 (2nd Cir.1980) (looking into a dwelling window with telescopic lens invades Fourth Amendment privacy interest). The objective manifestations of a privacy expectation must be *in* some place and an expectation to be free *from* a certain kind of intrusion.

Here Dow had an actual expectation of privacy in certain parts of its plant, privacy which included the freedom from certain kinds of intrusion. Dow took great pains to be free from ground level intrusion by building a perimeter security fence and employing security guards. 536 F.Supp. at 1364–65. Hence, Dow had a kind of actual privacy expectation in these parts of its plant, a privacy interest to be free from ground level intrusions from the street. But Dow did not take any precautions against aerial intrusions, even though the plant was near an airport and within the pattern of planes landing and taking off. If elaborate and expensive measures for ground security show that Dow has an actual expectation of privacy in ground security, as Dow argues, then taking no measure for aerial security should say something about its actual privacy expectation in being free from aerial observation. Certainly, no one could reasonably expect Dow to build a dome over its entire Midland plant in order to establish its expectation of privacy, free from aerial intruders. But it does not follow that Dow could not take any measures at all to shield outdoor spaces from aerial observers. Dow could have shielded the critical spaces in between

its buildings, if it had an actual expectation of privacy from aerial observation of these regions. A comparison of the precautions a person does take with the precautions he might take, when such precautions are feasible and not unreasonably expensive, is a factor to be considered in determining his privacy expectation *from the kind of intruder* about whom he is complaining. Dow has described no trade secret or confidential relationship outside its building walls that the observer from above would compromise, and Dow's objective behavior does not indicate an expectation to be free from the aerial spectator.

## IV.

■ We are not convinced that Dow had an actual expectation of privacy from the air, but even if Dow did have such an expectation the expectation was unreasonable. On this question, the District Court erred in dismissing defendant's "open field" argument. Dow's Midland plant is 2000 acres, located in an urban area near an airport and within the pattern of planes landing and taking off. Both the size and location of an entity must be taken into account in order to determine whether it is objectively reasonable to expect privacy in all or part of that entity. Dow's size and location militate against regarding an expectation of privacy free from aerial observation as reasonable. When the entity observed is a multi-building complex, and the area observed is the outside of these buildings and the spaces in between the buildings, and when the complex is near an airport and within the pattern of planes landing and taking off, it is difficult to see how a reasonable person would have privacy expectations in the outside of the buildings and the spaces between the buildings.

■ Although the analogy is not perfect, Dow's Midland plant is much more like "open fields" than it is a home or office. When the area observed is like an open field, an inspection which would otherwise be a search becomes a non-search for Fourth Amendment purposes. *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68

L.Ed. 898 (1924); *Air Pollution Variance Board v. Western Alfalfa Corp.,* 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974). The Supreme Court recently reaffirmed the "open fields" doctrine and interpreted it in light of *Katz. Oliver v. United States,* —— U.S. ——, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The Court held that individuals cannot demand privacy rights for activities conducted in what are essentially open fields. The context or conditions for privacy are not present there, and such demands are not reasonable. *Id.* In affirming this Court in *Oliver,* the Supreme Court made reference to and quoted with apparent approval from a passage in our opinion, the full text of which reads as follows:

> The Fourth Amendment and other laws protecting privacy create the conditions and the context for many relationships based on intimacy, friendship and trust. These laws establish an environment in which individual emotional and mental processes can develop freely without surveillance or interference. The legal principles that protect privacy, therefore, do not protect the desert island, the mountain top or the open field—even one the owner has posted with a "no trespass" sign. The human relations that create the need for privacy do not ordinarily take place in these settings. The only significant interest at stake here—a property owner's interest in excluding others from his possessions—is not sufficient alone to bring into play legal principles protecting privacy.

*United States v. Oliver,* 686 F.2d 356, 360 (6th Cir.1982) (en banc). Our reasoning there leads to the conclusion here that the interior spaces outside Dow's buildings are not places in which one may have a reasonable privacy expectation.

It is true that certain outside areas associated with a home or dwelling have traditionally received Fourth Amendment protection as falling within the "curtilage." Thus, the Fourth Amendment has been held to apply to the search of a smokehouse located within a fenced yard, *see Robertson v. United States,* 165 F.2d 752

(6th Cir.1948), and to a honeysuckle patch situated within a fence 150 feet from a home. *See United States v. Van Dyke,* 643 F.2d 992 (4th Cir.1981).

■ It can be argued here that the areas in between Dow's buildings formed a sort of industrial curtilage, and therefore should receive Fourth Amendment protection. However, to apply the curtilage doctrine to this 2000-acre manufacturing complex would be a distortion of the principles on which the doctrine rests. The doctrine of curtilage is grounded in the peculiarly strong concepts of intimacy, personal autonomy and privacy associated with the home. The home is fundamentally a sanctuary, where personal concepts of self and family are forged, where relationships are nurtured and where people normally feel free to express themselves in intimate ways. The potent individual privacy interests that inhere in living within a home expand into the areas that enclose the home as well. The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is not true simply in a mechanical sense because the areas are geographically proximate. It is true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house. Personal interactions, daily routines and intimate relationships revolve around the entire home place. There are compelling reasons, then, for applying Fourth Amendment protection to the entire dwelling area.

Dow has legitimate privacy interests in many aspects of its corporate life. Dow has strong expectations of privacy within its offices and inside its enclosed facilities. These interests are not so powerful that they automatically apply to the exterior of Dow's plant. In the home setting, Fourth Amendment protection applies to adjoining areas because of the unique privacy interests associated with dwelling places, and because of our traditional understanding that home life is not confined to the physical structure of the house. The areas between industrial buildings do not normally share the same uses.

■ Although Dow has a reasonable expectation of privacy in the interior of its plant buildings and offices, this is not to say that such a privacy interest has equal force to that which inheres in a dwelling. Indeed, the Court's ruling in *Marshall v. Barlow's, Inc., supra,* that a lesser showing of probable cause is required to secure an administrative warrant, is evidence of this difference. The Court has noted that a commercial owner's privacy interest "differs significantly from the sanctity accorded an individual's home." *Donovan v. Dewey,* 452 U.S. 594, 598–99, 101 S.Ct. 2534, 2538, 69 L.Ed.2d 262 (1981). Dow's reasonable privacy interest in the interior of its buildings does not extend into the areas between the buildings because, unlike the home setting, there is no compelling reason in terms of privacy to justify this extension. After a diligent search we have found no cases applying the curtilage concept to the commercial setting. Although there may be some places for research and development or employee interaction which justify an extension of the concept, we hold that the common law curtilage doctrine does not apply to this particular manufacturing setting.

### V.

Finally, much is made of the government's use of sophisticated photographic equipment from the air. The District Court found that such sophisticated technology violated Dow's Fourth Amendment rights because the extreme detail of the photographs enabled a viewer to observe "more than the human eye could ever see." 536 F.Supp. at 1367.

■ The government conducts a search when it uses "enhanced viewing of the interior of a home," because it impairs "a legitimate expectation of privacy and encounters the Fourth Amendment's warrant requirement." *United States v. Taborda,* 635 F.2d 131, 139 (2nd Cir.1980). Had the EPA's aerial photography of Dow's plant intruded *inside* the plant offices, file rooms

and eating areas, it would be proscribed by *Taborda*.[2] As we have already discussed, it is unpersuasive, however, to compare the spaces in between Dow's buildings as anything like the interior of a home or its curtilage. The outdoor spaces of a chemical plant are simply a necessary feature of a plant, a complex of buildings, having several disparate buildings. Dow has not described what privacy interests contained in these spaces make enhanced viewing violative of the Fourth Amendment.

## VI.

■ The District Court also erred in upholding Dow's contention that EPA's use of enhanced aerial observation as an inspection technique exceeded the agency's authority under the Clean Air Act. The District Court held that section 114 of the Clean Air Act, 42 U.S.C. § 7414, does not authorize aerial photography as an investigatory tool "even by reasonable implication." 536 F.Supp. at 1374. This finding was based on the court's statutory interpretation of section 114(a)(2)(A), which provides that "upon presentation of credentials," the EPA has a "right of entry to, upon, or through any premises." 42 U.S.C. § 7414(a)(2)(A). In holding that enhanced aerial surveillance was not impliedly authorized by section 114, the court found that the language of the statute pointed to the conclusion that Congress meant only to authorize "land-based examination of emission sources." 536 F.Supp. at 1374.

■ Although the statute does not expressly authorize enhanced aerial observation, the language of section 114 clearly does not foreclose this technique. Congress has delegated general investigative authority to EPA under the Clean Air Act. EPA investigators may go to the library to research a company, talk to its employees and former employees and observe the plant from different vantage points with-

out making an "entry" on the premises which requires notification. Other law enforcement officers who use aerial observation in their work, *e.g.*, drug enforcement and traffic officers, coast guard and property tax mapping officials, do not have to announce their presence in advance or present credentials. Like these officers, EPA investigators should be permitted to use aerial photography as a part of their general investigative authority. Congress need not expressly delegate this authority to EPA just as it need not expressly delegate it to the FBI or the DEA or to military investigators. So long as these investigators operate in the public air space and do not intrude into areas protected by the Fourth Amendment, they may use an airplane and a camera without presentation of credentials to the owners of property over which they fly.

Accordingly, the judgment of the District Court is reversed. Costs are assessed against appellee.

---

**2.** Our reasoning in this regard is similar to that of the Ninth Circuit in *United States v. Allen,* 633 F.2d 1282 (9th Cir.1980). In *Allen,* aerial photographs were taken of the exterior of ranch buildings and grounds. When enlarged, these photographs showed details of drug smuggling operations. The Ninth Circuit held that the

warrantless helicopter surveillance of the coastal ranch was not a search under the Fourth Amendment. The Court observed that the case did not present "privacy expectations associated with the interiors of residences or other structures." 633 F.2d at 1289.