**William P. ALLINDER and Caroline I. Allinder d/b/a Sunnyside Bee Farm; Elmer Steiner and Marilyn L. Steiner, Plaintiffs-Appellees,**

v.

**STATE OF OHIO; Ohio Department of Agriculture; Dale Locker, Director of Ohio Department of Agriculture; Eric Nelson, Hardin County Bee Inspector, Defendants-Appellants.**

Nos. 85–3664, 85–3807.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1986.

Decided Jan. 8, 1987.

John K. Maguire (argued), Asst. Atty. Gen., Columbus, Ohio, for defendants-appellants.

Gregory L. Arnold (argued), Arnold & Barrett, Toledo, Ohio, for plaintiffs-appellees.

Before ENGEL and MARTIN, Circuit Judges, and COHN *, District Judge.

COHN, District Judge.

## I. INTRODUCTION.

### A. Nature of the Case.

This case involves a fourth amendment challenge to the scope of section 909.05 of the Ohio Revised Code (ORC) which empowers the Ohio Director of Agriculture or his authorized representative to conduct warrantless searches of apiaries and other premises, buildings or places where bees or bee paraphernalia are kept.[1] After notification of a planned warrantless inspection of their apiaries, the plaintiff-beekeepers commenced separate actions for declaratory and injunctive relief in the United States District Court for the Northern District of Ohio. The district court granted the plaintiffs' motion for partial summary judgment in the *Allinder* action and permanently enjoined the Ohio Department of Agriculture from "conducting warrantless, nonconsensual inspections of apiaries pursuant to the Ohio Apiary Inspection Law, ORC § 909.-05" on the grounds the law was unconstitutional "insofar as it purports to authorize non-consensual apiary inspections without a warrant or its equivalent." *Allinder v. Ohio*, 614 F.Supp. 282 (N.D.Ohio 1985). The *Steiner* plaintiffs and defendants stipulated that the order entered in the *Allinder* action would apply in the *Steiner* action, and that the two actions would be consolidated for purposes of appeal and trial on the remaining issues. Defendants appeal from the injunctive orders in both cases. This court consolidated the two actions on appeal. For the reasons which follow, we affirm the district court in substantial part.

### B. The Regulatory Scheme.

Pursuant to Chapter 909 of the ORC, Ohio maintains an apiary[2] inspection pro-

---

* The Honorable Avern Cohn, United States District Judge, Eastern District of Michigan, sitting by designation.

1. O.R.C. § 909.05 reads:
   To enforce sections 909.01 to 909.18, inclusive, of the Revised Code, the director of agriculture or his authorized representatives shall have access to and egress from any apiary or to any premises, buildings, or any other place, public or private, in which he has reason to believe that bees, honey, wax, used hives, or used appliances are kept. No person shall resist or hinder the director or his authorized representative in the discharge of their duties under such sections. No occupied dwelling may be entered without a search warrant. O.R.C. § 909.05 is part of Chapter 909: APIARIES of the Ohio Revised Code. Relevant sections will be described as necessary.

2. O.R.C. § 909.01(D) defines an apiary as "any place where one or more colonies or nuclei of bees are kept."

gram.[3] The program is designed to detect bee diseases in their early stages and to prevent their spread. ORC § 909.03 declares infected hives a public nuisance. Under ORC § 909.03, the director of agriculture has rulemaking and enforcement powers "as in his judgment are necessary to control, eradicate, or prevent the introduction, spread, or dissemination of any bee diseases." Of particular concern in the production of honey and pollination of crops is the spread of American Foulbrood disease (AFB) which infects the preadult stage of the bee.[4] Although the disease is not harmful to humans, it can destroy entire colonies of bees. Under ORC § 909.02, a beekeeper must register his apiaries with the director of agriculture along with directions as to their location. Not all beekeepers are registered, primarily because of their ignorance of the statutory requirements. The program is enforced by the state apiarist, four deputy apiarists, and part-time county inspectors who are appointed and funded by the individual counties and over whom the state retains little control.[5] Because of the technical knowledge needed to make inspections, inspectors are often competitors of those whom they inspect and are often charged with the responsibility of inspecting their own apiaries. Under ORC § 909.05, an inspector is expressly authorized to examine apiaries without prior notice, without a warrant and outside the presence of the owners.

There are no published rules and regulations. The inspectors are provided a training manual which appears to outline the goals and guidelines of the program. Final decisions as to what to inspect, how to inspect and when to inspect rests with the individual inspectors.

Inspection involves manipulation of the hive[6] and not merely visual inspection of the exterior of an apiary. The inspector approaches the hive and removes the lid with a crowbar-like hive tool. The front entrance of the hive is then smoked with another appliance to subdue the bees. Smoking continues as needed throughout the inspection process. The inner cover, honey layers, queen excluder, and other layers are manipulated and removed to arrive at the bottom layers where the brood[7] chambers are located. All the layers in the hive are stuck together with propolis, a sticky substance which the bees process from tree residues, and which generally has to be pried from the hive. Some of the brood frames are then removed and examined for signs of disease. If the inspector diagnoses AFB, surrounding colonies or sometimes the entire apiary is quarantined under ORC § 909.04. A sample is taken from the colony and sent to the Ohio Department of Agriculture laboratory for testing. If the presence of AFB is confirmed, the bees and hive equipment are ordered destroyed by burning. Under ORC § 909.16, the beekeeper has five days within which to appeal the decision to burn the bees and equipment to the Director of Agriculture whose determination is final.

### C. The Parties.

The Allinders and the Steiners are commercial beekeepers in the business of raising bees for honey production and renting bees to farmers for crop pollination. The Allinders' 600 hives and the Steiners' ap-

---

3. A number of states have such programs. For a listing of federal and state bee disease laws, see *Honey Bee Pests, Preditors, And Diseases* Appendix 3 (R. Morse ed., Cornell University Press, 1978). The warrantless search privilege at issue here appears to be an exception.

4. *See Identification and Control of Honey Bee Diseases,* Farmer's Bulletin No. 7255, Agricultural Research Service, U.S. Department of Agriculture.

5. Two counties in Ohio did not appoint inspectors for 1983.

6. O.R.C. § 909.01(F) defines a hive as "any modern frame hive, box hive, box ... or any other receptacle, natural or artificial, or any part thereof, which may be used as a domicile for bees."

7. Brood refers to the preadult stage of the bee. The honey is kept in layers separate from where the queen lays her eggs or the brood. Most hives contain a "queen excluder" which keeps the queen from traveling to the honey layers and depositing her eggs there.

proximately 850 hives are located in seven different counties in Ohio. They registered their apiaries with the added notation "No inspection permitted without a warrant."

## II. THE ELEVENTH AMENDMENT.

### A. The State Defendants.

■ Defendants first argue that the district court did not have jurisdiction under the eleventh amendment bar to an action against the State. The argument has merit as to defendants State of Ohio and Ohio Department of Agriculture. The Supreme Court has consistently interpreted the eleventh amendment to preclude a citizen from bringing suit against his own state in a federal court. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Employees v. Dep't of Public Health and Welfare of Missouri,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). Contrary to plaintiffs' contention that defendants have waived immunity by proceeding in these actions, a waiver of eleventh amendment immunity will be found only where indicated " 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' " *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1361 (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed.2d 742 (1909)); *Ohio v. Madeline Marie Nursing Homes #1 and #2,* 694 F.2d 449 (6th Cir.1982). The defense may be raised for the first time on appeal, *Edelman,* 415 U.S. at 678, 94 S.Ct. at 1363, and a state's appearance and offer of defenses on the merits is no bar; the defense is jurisdictional and may be raised at any stage of the proceedings. *Florida Dep't of State v. Treasury Salvors, Inc.,* 458 U.S. 670, 683 n. 18, 102 S.Ct. 3304, 3314 n. 18, 73 L.Ed.2d 1057 (1982) (Opinion of Stevens, J.). Defendants asserted the eleventh amendment as an affirmative defense in their answers to the complaints in both actions and have never indicated an intention to waive the defense. *See Madeline Marie Nursing Homes #1 and #2,* 694 F.2d 449. The State of Ohio and the Ohio

Department of Agriculture must be dismissed as defendants for lack of jurisdiction.

### B. The Individual Defendants.

■ The eleventh amendment defense of defendants Eric Nelson, a bee inspector in the *Steiner* action, and Dale Locker, the director of the Ohio Department of Agriculture in both actions, implicates an exception to eleventh amendment immunity first recognized in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Young,* the Supreme Court held that state immunity did not shield a state official attempting to enforce an unconstitutional act. Under *Young,* a state cannot transfer its immunity to an official who must accede to his "responsibility to the supreme authority of the United States." 209 U.S. at 160, 28 S.Ct. at 454. Accordingly, Nelson and Locker are proper defendants.

## III. THE FOURTH AMENDMENT.

### A. The Existence of a Search.

#### 1. Open Fields.

Before invoking the fourth amendment, we must first determine if there has been a search. *Dow Chemical Co. v. United States,* 749 F.2d 307, 311 (6th Cir.1984), aff'd, —— U.S. ——, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). Defendants argue that no search occurred, relying on the "open fields" doctrine first enunciated in *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), and recently reaffirmed in *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). In both *Hester* and *Oliver,* the Supreme Court held that a visual observation of an open field did not violate the fourth amendment.

■ Defendants' reliance on these cases is misplaced. *Oliver* did not overrule the holding in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that the fourth amendment protects per-

sons and not places.[8] *See* 466 U.S. at 176 n. 6, 104 S.Ct. at 1740 n. 6. *Oliver* focused on factors such as the "intention of the Framers of the Fourth Amendment", the uses to which a location is put and the societal understanding as to areas deserving protection from government invasion in concluding that society does not recognize an expectation of privacy in open fields as reasonable. *Id.* at 178–79, 104 S.Ct. at 1741. In decisions following *Katz*, the Supreme Court has consistently adhered to the open fields doctrine while at the same time recognizing that it is limited in scope to "sights seen in 'the open fields.'" *Air Pollution Variance Bd. of Colorado v. Western Alfalfa Corp.*, 416 U.S. 861, 865, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974). In *Air Pollution Variance Bd.*, the Supreme Court held that a field inspector did not violate the fourth amendment when he stood on the property of defendant to observe plumes of smoke and visually rate them as to air pollution standards. The Court carefully noted that the inspector did not enter the physical plant or inspect the files, papers or equipment of defendant. *Id.* at 864–65, 94 S.Ct. at 2115–16.

Similarly, in *Maine v. Thornton*, a case consolidated with *Oliver*, the officers making a visual inspection of fields spotted marihuana growing, but they obtained a search warrant before they seized the marihuana. 466 U.S. at 174, 104 S.Ct. at 1739. In *Maine*, the Supreme Court also distinguished the fourth amendment protection afforded to "effects" by limiting the term "effect" to personal rather than real property." *Id.* at 177 n. 7, 104 S.Ct. at 1740 n. 7.

More recently, in *Dow Chemical Co. v. United States*, the Supreme Court applied the open fields doctrine to uphold the aerial observation and photography of an industrial plant complex. The Supreme Court did acknowledge that defendant had a legitimate expectation of privacy from unreasonable government entries into its covered buildings and private commercial property while emphasizing that the observation took place "*without* physical entry", and that any such entry would raise "significantly different questions." 106 S.Ct. at 1825–26 (emphasis in original).

**2. Limitations on Open Fields.**

There is no case, however, where the open fields doctrine has been applied to allow a search of personal effects or of a commercial structure in a field. Defendants attempt to extend the holding in *Oliver* beyond the open fields exception it addressed, and into the realm of structures as presented in this case, must fail. To so extend the open fields exception, we would have to ignore a long line of Supreme Court cases which have extended fourth amendment protection to areas other than the home and its curtilage. *Cf. Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (stone quarry); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (luggage); *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (store); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (employee working area of business premises); *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (office); *United States v. Chadwick*, 433 U.S. 1, 538, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (footlocker); *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) (office); *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (locked commercial warehouse).[9]

---

8. In *Katz*, the Supreme Court defined the two elements necessary to constitute a search under fourth amendment standards: (i) an actual or subjective expectation of privacy (ii) that society would deem reasonable. 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). The notation placed on plaintiff's registration form certainly created in them the necessary subjective expectation.

9. The case closest to the circumstances involved here is *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). *Cady* involved an automobile which had been parked in a field. After viewing a bloody interior of the car through a window, a police officer obtained a search warrant. The search turned up a bloody sock and floor mat. The defendant argued that the search was illegal because the two

### B. Apiaries.

Inspections authorized by ORC § 905.05, and the inspections to which plaintiffs object here, do not involve a mere visual inspection of apiaries in an open field. Rather, the statute allows a· warrantless inspection of "any premises, buildings, or any other place, public or private, in which [the Director of Agriculture or his authorized representatives have] reason to believe that bees, honey, wax, used hives, or used appliances are kept," except "occupied dwelling[s]." *Id.* Thus, for example, it allows for an entry into any commercial structure where bee equipment is stored. But as the Supreme Court has explained: while the government may observe, without a warrant, whatever is observable by the public, areas where only employees are permitted are not "thrown open ... to the warrantless scrutiny of Government agents." *Barlow's, Inc.,* 436 U.S. at 315, 98 S.Ct. at 1822. "[R]easonableness is still the ultimate standard." *Id.* (quoting *Camara v. Municipal Court,* 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967)).

▮ Nor can the warrantless physical intrusion, manipulation and dismantling of the hives themselves be sanctioned by the visual inspection allowable under the open fields doctrine. Apiaries are commercial property. They are also personal property since they are movable and at times are moved for rental to farmers in crop pollination. As such they fall within the definition of effects in *Oliver,* 466 U.S. at 177 n. 7, 104 S.Ct. at 1740 n. 7,[10] and are therefore expressly afforded protection by the fourth amendment.

While the hives are subject to visual observation of their exteriors by a passerby, there is no claim that the hives give the appearance of abandoned property. In-

spections can only be performed by a trained apiarist. The hives have bees entering and exiting at all times. As previously described, a smoker must be used to subdue the bees to enable an inspector to approach a hive, and a special hive tool must be used to pry apart the layers of the hive. With the exception of the small opening for bees, the hive is virtually sealed shut with bee propolis. The interior of the hives are simply not accessible to the public's view. The apiaries are "effects" and as such are part of plaintiffs' commercial personal property. We conclude that the physical intrusion, manipulation and dismantling of the hives by a state inspector constitutes a search under the fourth amendment.

### C. The Administrative Search Exception to the Warrant Requirement.

For nearly two decades, the Supreme Court has followed the general rule that a warrant is required before conducting an administrative search of commercial property or commercial products. *See v. City of Seattle,* 387 U.S. at 544–45, 87 S.Ct. at 1739–40. In *See,* the Supreme Court concluded that "warrants are a necessary and a tolerable limitation on the right to enter upon and inspect commercial premises." 387 U.S. at 544, 87 S.Ct. at 1740.

▮ Later decisions have limited this rule so that the fourth amendment does not prohibit all such searches, but only those that are unreasonable. *Donovan,* 452 U.S. at 599, 101 S.Ct. at 2538. In *Donovan,* the Supreme Court held that in certain limited situations, warrantless administrative searches of commercial property do not violate the fourth amendment. This Circuit has characterized these exceptions un-

---

items were not particularly described in the warrant. The Supreme Court upheld the search on the basis of the warrant and added, "We therefore need not reach the question of whether ... a search of the back seat of this car, located as it was in an open field, required a search warrant at all." *Id.* at 449–50, 93 S.Ct. at 2532. *Cady* is also distinguishable because the automobile was found abandoned in a field, and

the Supreme Court decisions have consistently provided a lesser degree of protection to automobiles because of their mobility.

**10.** "The Framers would have understood the term 'effects' to be limited to personal, rather than real, property."

der the rationale of "the notion of implied consent." *Dow Chemical Co.*, 749 F.2d at 311 n. 1; *see also, Barlow's, Inc.*, 436 U.S. at 313, 98 S.Ct. at 1820–21. However, since this form of search is an exception to the warrant requirement, the burden of proof rests with the party asserting the exception. *See Barlow's, Inc.*, 436 U.S. at 324, 98 S.Ct. at 1826.

### 1. Pervasively and Closely Regulated Industries.

An exception to the warrant requirement exists for "closely regulated industries long subject to inspection" and for "pervasively regulated" businesses, *Barlow's, Inc.*, 436 U.S. at 313, 98 S.Ct. at 1820–21, for which, because of the nature of the regulation, no reasonable expectation of privacy exists. *Cf. Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (premises of retail dealer in liquor); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (pawn shop).

Defendants argue that the state regulatory scheme involved here amounts to close and pervasive regulation. But as the district court noted:

> The state apiarist testified that less than 100% of the beekeepers in Ohio are registered and that only about 85% of those registered are inspected every year. (Inj.Tr. at 33). He testified further that the typical reason for failure to register colonies is beekeepers who are unaware of the registration and inspection requirements.[11]

■ Moreover, the statute does not pervasively regulate the beekeeping industry. Defendants concede that the limited function of the statutory scheme is to control and eradicate bee diseases. We conclude that defendants have failed to establish that a beekeeper's expectation of privacy in an apiary is unreasonable where the record fails to show either that the beekeeping industry has a long history of close regulation or that it is currently subject to pervasive and comprehensive regulation in Ohio.

### 2. A Predictable and Guided Regulatory Presence.

In *Donovan*, 452 U.S. at 604, 101 S.Ct. at 2541, the Supreme Court acknowledged another exception to the warrant requirement: A warrantless search is permissable if a statute "establishe[s] a predictable and guided federal regulatory presence." See also *Dow Chemical*, 749 F.2d at 311 n. 1: "Inherent in this exception is a test that balances the strength of the federal regulatory interest, on the one hand, with the reasonable expectation of privacy of the commercial entity on the other."

In *Donovan* the Supreme Court explained the criteria necessary to establish this exception as follows:

> [A] warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.

452 U.S. at 600, 101 S.Ct. at 2539.

■ Defendants argue that inspections of apiaries must be warrantless because of the need to retain the element of surprise so that a beekeeper cannot hide a diseased hive from the inspector's view. Apiaries, defendants say, are so spread out and are so mobile, this is easy to hide from inspectors. They further argue that since the inspection season is limited, because inspections can only be conducted on a warm, dry day, and since most of the inspectors work part-time only, time is of the essence, and it would be an administrative burden to require a warrant.

The district court rejected these arguments in light of the testimony of the state apiarist that most beekeepers were hobbyists who welcomed inspections as an aid, and in light of testimony that plaintiffs

---

**11.** *Allinder v. Ohio*, 614 F.Supp. 282, 285 (N.D. Ohio 1985).

were notified of an inspection three days in advance. The district court noted that the high incidence of voluntary compliance refuted the argument as to administrative burden because most inspections would not require a warrant.

This same line of argument was rejected in *Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816 (an electrical and plumbing installation business). In that case the Supreme Court noted that the government could obtain warrants *ex parte* and issue them without notice, thus retaining the element of surprise. The Supreme Court also rejected the administrative burden argument by reasoning that the government had failed to show that the required time lapse for obtaining the warrant seriously impeded the statute's effectiveness. *Id.* at 316–19, 98 S.Ct. at 1822–24. In reaching this conclusion the Supreme Court noted the lower standard of proof for justifying issuance of an administrative search warrant. *Id.* at 320, 98 S.Ct. at 1824.

The district court also concluded that the program was subject to the warrant requirement because the statute provided too much discretion, i.e., it did not provide certainty, regularity and fairness. There is no requirement that inspections are to occur on any predetermined regular basis; there is only a "goal" to provide yearly inspections. Defendants concede that they are hampered in reaching this goal because of a lack of funds, that available funds were subject to the discretion of the various counties who provided supplementary inspectors and that the goal had not been achieved.

■■■■ Like the statute in *Barlow's, Inc.*, 436 U.S. at 323, 98 S.Ct. at 1826, the

program scheme simply provides too much discretion in the individual inspector. Like the statute in *Barlow's, Inc.*, the program "fails to tailor the scope and frequency of such administrative inspections to the particular" purpose. *Donovan*, 452 U.S. at 601, 101 S.Ct. at 2539. The program is ripe for potential abuse, especially because inspectors are often competitors of the apiaries inspected. Because an apiarist never knows when an inspection is due, and need not be present at an inspection, such broad discretion in inspectors can lead to problems as to hives which cannot be moved or disturbed, e.g., because of requeening. Exceptions to the warrant requirement are limited to those situations where the regulation scheme provides all the protection that a warrant would otherwise provide. *Donovan*, 452 U.S. at 598–99, 605, 101 S.Ct. at 2537–38, 2541. This condition is simply not met by the program at issue here.

In *Barlow's, Inc.*, the Supreme Court concluded:

> A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria.

436 U.S. at 323, 98 S.Ct. at 1826.

We agree. Our decision today does not invalidate the entire regulatory scheme. Rather, we hold only that ORC § 909.05 authorizing nonconsensual warrantless inspections is unconstitutional.

The decision of the district court is AFFIRMED in part and REVERSED in part, and this case is REMANDED to the district court for further proceedings.[12]

---

12. In response to the dissent's position that what we decide today is "potential and [hypothetical]", we are satisfied that the dispute between the Allinders, the Steiners and the Ohio Department of Agriculture is not an "imaginary" one. *Yazoo and Mississippi Valley R.R. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 220, 33 S.Ct. 40, 41, 57 L.Ed. 193 (1912) (the Court must decide the case at hand, and how the state court may apply the statute at issue to other cases, and how far parts of it may be sustained if others fail are matters upon which we need not speculate now). Plain-

tiffs are clearly threatened with warrantless searches of their apiaries under the authority of O.R.C. § 909.05, and O.R.C. §§ 909.18 and 909.99 subject them to a penalty should they resist. They have shown they are injured by the operation of O.R.C. § 909.05, *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (the Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation), and we

ENGEL, Circuit Judge, dissenting.

I respectfully dissent. I would hold that the right to be free from unreasonable searches and seizures under the Fourth Amendment is not infringed by the inspection of beehives located in open fields by state apiarists in accordance with the challenged state statute. I would so hold because in my opinion there is no reasonable expectation of privacy either on an objective basis, *see Katz*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), or on a subjective basis, *see Smith v. Maryland*, 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580–81 (1979), in the contents of the hives. They were placed in the open fields with full knowledge that they were subject to inspection.

The majority opinion addresses potential, hypothetical concerns which are not present here. It assumes bad faith and motives on the part of the inspector which are not present in the record. To me it is enough to hold that the Ohio statute is valid as applied to the present circumstances. *Yazoo & M.V.R.R. v. Jackson Vinegar Co.*, 226 U.S. 217, 219–20, 33 S.Ct. 40, 40–41, 57 L.Ed. 193 (1912).

This Court, as is the case with all federal courts, "has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.... [A]pplication of this rule frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.

*United States v. Raines*, 362 U.S. 17, 21–22, 80 S.Ct. 519, 522–23, 4 L.Ed.2d 524 (1960) (citations omitted, but include *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347–48, 56 S.Ct. 466, 483, 80 L.Ed. 688 (Brandeis, J., concurring)).

The record here shows that deputy inspector Lamp on behalf of the state informed the Allinders that he would appear "at their residence" without a warrant to search all of their apiaries containing beehives. Steiner also received prior notice. Allinder refused to let Lamp enter any part of his land and did not prohibit entry only to the curtilage. There is nothing in the record to suggest that the hives in question were within the curtilage or within any other outbuilding to which any independent expectation of privacy protectable under the Fourth Amendment might have attached.

No one disputes that American foulbrood is a serious disease for bees. That the disease poses no threat to humans may lessen but does not remove the legitimate state concern in the regulation of this industry. As I understand it, the time period for the disease to spread is relatively long, as spores can sit within the hive for 10, 12 or 14 days before the disease attacks the bees. The disease actually attacks the bee

have not confronted "a hypothetical case thus imagined." *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960) (the delicate power of pronouncing a statute unconstitutional is not to be exercised with reference to hypothetical cases thus imagined). Also, it should be noted that our decision is consistent with the decision of the Supreme Court of Pennsylvania in *Commonwealth v. Lutz*, 516 A.2d 339 (Pa.Sup.Ct.1986), holding a Pennsylvania statute that authorizes warrantless searches of premises holding nonhazardous wastes unconstitutional on the grounds that there was a lack of reasonable legislative or administrative standards governing such searches.

larvae and it is spread by a process called "robbing."

The act of inspection takes about five minutes per colony. During the search, the apiarist is smoking the front entrance periodically to subdue the bees, but the smoking does not occur during the whole search. It seems unquestioned that to determine if a particular hive has been infected, an apiarist must take off the cover, the queen excluder, the inner cover, and the frames since the disease does not manifest itself to someone viewing the outside of the hive. Physical entry into the hive therefore is not an arbitrary act and there seems no other less intrusive way to carry out the legitimate purpose of the act. The plaintiffs do not claim an absolute right to be free from having their hives inspected by the state apiarists. That being true, they do not claim that they are free from having the hives disturbed to the extent necessary to carry out the statutory inspection.

The statutory scheme is quite pervasive. Every Ohio beekeeper under law must register the location of all of his bee colonies within the state. There is no penalty for knowingly maintaining diseased hives, but there is a penalty for failing to register. As the majority opinion notes, less than 100 percent of the beekeepers comply, apparently because many are amateurs ignorant of the statutory scheme. And likewise, not all hives registered are in fact inspected. Neither of these factors I believe affects the validity of the regulation or of inspections carried out under it, nor do they affect the question of whether the inspection process intrudes upon any areas or protected zones of privacy under the Fourth Amendment. The Department's county inspectors try to find unregistered colonies and to make personal visits. They also send letters in an effort to increase compliance. The statute does not specify any regular period for inspection, but according to the record the Department tries to inspect each hive once a year. Allinder's hives were inspected every year from 1973 until the litigation was commenced.

If foulbrood is found, a sample is sent to a state laboratory. While the sample is at the lab, a quarantine is made prohibiting the beekeeper from removing the bees from the apiary. The colonies, however, are still active during the quarantine period. If the inspection itself reveals the existence of foulbrood, the plaintiffs do not and I think probably cannot claim the right to retain the bees or otherwise to contest the right of the state to have those bees destroyed. If the bees are diseased, undoubtedly a major economic loss could be involved, but the statute provides notice and opportunity to be heard before the bees can actually be destroyed. There is a danger of loss from the inspection, it is true. If the hive is improperly reassembled, error in this regard may cause the loss of a queen or distortion to the production of honey. In fact, if the queen is lost, so also is the hive's honey crop for the year.

Given these most apparent facts from the record, it seems to me that in determining whether any expectation of privacy should attach to the interior of a beehive in an open field depends upon whether that expectation is one which society is prepared to respect as worthy of privacy, and I simply cannot see that concept applying here. "[R]easonableness is still the ultimate standard." *Marshall v. Barlows, Inc.*, 436 U.S. 307, 315, 98 S.Ct. 1816, 1822, 56 L.Ed.2d 305 (1978) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967)). It does not seem to me that anyone who maintains a beehive in Ohio has any reasonable expectation that the contents of that beehive shall not be exposed to visual inspection by state inspectors as part of the necessary performance of their duties under an otherwise valid statute enacted pursuant to the state's police powers and in furtherance of the state's right to protect the public from harm.

It is true that the inspection statute at section 909.05 allows warrantless searches of hives and equipment so long as there is no intrusion into a dwelling. No expectation of privacy under the Fourth Amend-

ment extends to the conduct of the inspectors insofar as they enter upon the open fields, however, and visual observation of the hives in the open fields does not violate the Fourth Amendment. *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (reaffirming the original "open fields" doctrine first enunciated in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924)). The inspector's conduct which must be scrutinized, therefore, is the act of locating the hive in the open field and, having located it, in opening the hive and performing the necessary test to discover whether the larvae are infected.

I believe that the majority has been led into error by considerations which might arguably have due process implications but which are not involved in the values protected by the Fourth Amendment. It seems to me that the majority's reliance upon the law concerning structures such as outbuildings is simply inapplicable. The beehives are not places of human habitation or places where human beings could even expect to work or occupy and thus carry on activity in which they might have some expectation of privacy. Likewise, the beehives do not fit my understanding and concept of containers generally. Beehives are no doubt personal property but the law is clear that the amendment protects people and not property. *Katz*, 389 U.S. at 347, 88 S.Ct. at 507. Not all effects are protected by the Fourth Amendment against warrantless searches and not all real property is unprotected. *Carroll v. United States*, 267 U.S. 132, 151, 45 S.Ct. 280, 284, 69 L.Ed. 543 (1925) (upholding warrantless search of automobile while suggesting that a warrant would be required to search a dwelling). As the majority notes, *Oliver, supra,* protects the concepts of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, the real question is whether a beehive is the kind of effect to which there attaches a reasonable expectation of privacy.

I would agree with the majority that it makes no difference whether we consider the hives as "abandoned." Plainly they were not here as evidenced by the notices placed upon the registrations. Nor is the expectation of privacy lost because the use of the hives is commercial and not personal. I also readily recognize that in *Dow Chemical Co. v. United States*, —— U.S. ——, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), *aff'g* 749 F.2d 307 (6th Cir.1984), the Supreme Court applied the open field doctrine to uphold aerial observation and photography of an industrial plant complex while at the same time recognizing that the defendant Dow there had a legitimate expectation of privacy from unreasonable government entry into its covered buildings and private commercial property. It also noted that the aerial observation made in *Dow* took place "without physical entry" and that the Supreme Court observed that any such entry would raise "significantly different questions." 106 S.Ct. at 1825–26. I do not read anything, however, in *Dow*, or in any of the exceptions or the qualifying language of the opinions the majority cites, to indicate the recognition of a substantial privacy interest in personal property such as a beehive which contains only the things expected therein—bees, larvae, and all of the customary contents making up an operating colony for the production of honey. Certainly the bees have no privacy interest protectable under the Fourth Amendment. And unlike a container which may mask its contents and which may provide an aura of privacy for uncertain contents, here one finds exactly what one would expect. I therefore do not equate the hive to some type of luggage or other container which might potentially contain a wide variety of objects, some of which might be of a personal nature.

There may arguably be some authority to support the fact that because Allinder and Steiner had previously allowed inspection of their beehives, they had demonstrated no personal or subjective claim of privacy with respect to them, and therefore the reassembly of the hives would not revive or restore any previously recognized and lawfully invaded privacy rights. *See Illinois v. Andreas*, 463 U.S. 765, 103 S.Ct. 3319, 77

L.Ed.2d 1003 (1983), holding that a package once lawfully inspected without a warrant did not regain its privacy aspects when it was resealed and delivered to its addressee but after agents had discovered that it contained contraband. *See also Alinovi v. Worcester School Committee,* 777 F.2d 776 (1st Cir.1985). Although the majority of the Court held in *Andreas* that "absent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a container previously opened under lawful authority," 465 U.S. at 773, 103 S.Ct. at 3325, I do not think it is necessary to rely upon this proof to justify the search.

To me, the cases cited by the majority are inapposite. They apply to searches of structures where people have a reasonable expectation of privacy in carrying on commercial activities. Some involve invasion of containers in which similar expectations may exist because the owner might conceivably desire to keep from public view the undisclosed contents thereof. No surprises or commercial secrets are involved here. The hives contain the honey bees and the combs and the larvae. Some may be contaminated by foulbrood; nothing more, nothing less. I would vacate so much of the district court's decision as is inconsistent with the foregoing and remand for further proceedings.